## HODGSKIN et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

### No. 102.

1. Conspiracy ⊂⇒47—Finding that enemy alien was beneficial owner of corporate stock sustained.

In a prosecution for conspiracy to defraud the United States and to commit an offense against the same, by failing to transmit to the Alien Property Custodian a list of stockholders and of stock in which enemy aliens had an interest, as required by the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), evidence *held* to warrant a finding that an enemy alien was a beneficial owner of stock standing in the name of defendant citizen, and that the latter was guilty under Criminal Code, § 37 (Comp. St. § 10201).

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Conspiracy ⚖47—Evidence held to sustain conviction under Trading with the Enemy Act.**

In a prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to defraud the United States and to commit an offense by failing within 60 days after the passage of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. 1919, §§ 3115½a–3115½j) to report indebtedness to enemy aliens, evidence *held* sufficient to sustain a finding that an apparent extinguishment and appropriation of an alien's claim against the corporation was but a scheme to defraud the United States.

**3. Conspiracy ⚖47—Intent to defraud the United States by protecting interest of enemy alien held sufficiently shown.**

Assuming that criminal intent is essential to a conspiracy to defraud the United States, under Criminal Code, § 37 (Comp. St. § 10201), and the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), evidence *held* to warrant an inference of criminal intent in transfer of stock owned by an enemy alien to a citizen, and pretended extinguishment and appropriation of enemy alien's claim under a contract.

**4. Conspiracy ⚖45—Ante bellum acts held admissible, to show general plan to protect enemy alien's interests.**

In a prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to defraud the United States and to commit an offense, under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), by failing to report interest of enemy alien in corporate stock and indebtedness to such enemy alien, acts of accused before the United States entered the war in trying to get goods past the British sea power, by hiding the interest of the enemy alien, were admissible to establish a general plan of the defendants for the purpose of protecting the interests of the enemy alien.

**5. Criminal law ⚖351(10)—Destruction of records held admissible, as showing consciousness of guilt.**

In a prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to defraud the United States under the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), by hiding the interest of an enemy alien in a corporation, evidence of destruction by one accused of a letter press copy book containing records of communications with the enemy alien was relevant to show a course of conduct on the part of such defendant, showing a consciousness of guilt, in the sense of attempting to hide all evidence of communication between the corporation and the enemy alien, though it never appeared what those communications were.

**6. Conspiracy ⚖45—Failure of apparent owner of corporate stock to file claim when seized by Alien Property Custodian held admissible in prosecution for concealing interest of enemy alien.**

In a prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to defraud the United States and to commit an offense against the same, under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), by concealing interest of enemy alien in a corporation, the fact that a defendant, who was the apparent owner of corporate stock, never filed any claim for the return of the stock after it was seized by the Alien Property Custodian was admissible, as tending to show consciousness of guilt and lack of faith in the truthfulness of his assertion that he was the beneficial owner of the stock.

**7. Criminal law ⚖723(1)—Argument of prosecuting attorney held not error.**

In a prosecution for conspiracy to conceal the interest of an enemy alien in a corporation under Criminal Code, § 37 (Comp. St. § 10201), and Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), the characterizing of one of the defendants as a Prussian, whose loyalty to the enemy alien and to Germany prevented him from being faithless to his employers, *held* not to require a reversal.

**8. Criminal law ⚖1134(3)—Severity of sentence not reviewable.**

The fact that sentence was severe is not reviewable on writ of error.

Manton, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Thomas Ellet Hodgskin and George Simon were convicted of conspiracy to defraud the United States and to commit an offense, by failing within 60 days after the passage of the Trading with the Enemy Act of October 6, 1917, to transmit to the Alien Property Custodian a list of stockholders in a corporation, etc., and bring error. Affirmed.

Facts uncontradicted are that prior to 1900 there existed and still exists a German corporation operating near Dresden, which will hereinafter be called the Fabrik. In the year just given it caused to be organized a New Jersey company, established at Garfield, N. J., for the purpose (largely at all events) of supplying the American market with chemicals identical with those made in Germany by the parent concern, and of making the same under formulæ obtainable only from the Fabrik. This last corporation will be referred to as the Heyden. Its capital stock consisted of 750 shares, par $200, and of this issue the Fabrik owned of record 745 shares.

Defendant Simon, born a German, came to the United States in 1900, as the representative of this Fabrik, and as such organized the Heyden. During nearly the whole life of the Heyden, down to July 12, 1918, Simon was a director, and most of the time the treasurer, of that company. He never became naturalized, though he attempted citizenship, and failed through some error in his declaration of intent. His holding of stock never exceeded one share. Defendant Hodgskin is a citizen, and a member of the bar, and for a period not stated had been the "advising attorney" of the Heyden before April, 1916.

The Heyden business was successful from the start, and its relation to the Fabrik was stated for the future by a written agreement dated October 1, 1905. This contract recites that down to date the Fabrik had furnished in money or merchandise about $250,000 to the Heyden, on which interest had been duly paid. It had also given instructions as to the manufacture of some 15 chemicals, whereupon the contracting parties (Fabrik and Heyden) agreed that the $250,000 was to remain "as further partnership investment with" the Heyden; also that on this "investment" no further interest was to be paid, but that annually the Heyden's business, which was to be "carried on for mutual account," should be "figured out in the same manner as before," and divided so that Heyden should get enough to pay an 8 per cent. dividend and such "bonuses" as were due its directors and "other officials," but all the rest of the net profits belonged to the Fabrik, "as its share of the profit." If the business showed a loss, it was to be equally divided between the contracting parties.

The Fabrik agreed to furnish Heyden, "without further payment, other patents and manufacturing processes, as far as their adoption in the factory at Garfield is considered desirable by both parties." The Fabrik's consent was necessary to the employment and pay scale of the Heyden's "officers and higher employés." This agreement was specifically not limited in time, but might be "terminated by either party only by giving" six months' notice of such intent, the "notice to be effective at the end of a business year" of the Heyden. The fiscal year of that company ended each September 30th.

The indictment drawn under Criminal Code, § 37 (Comp. St. § 10201), charges Simon, Hodgskin, and the Heyden (the latter not indicted) with a conspiracy (first count) to defraud the United States, and (second count) to commit an offense against the same, by failing within 60 days after the passage of the Trading with the Enemy Act of October 6, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), to transmit to the Alien Property Custodian a list of every stockholder in the Heyden whom the certifying representative of the Heyden had reasonable cause to believe was an enemy alien, and of stock in which such aliens had an interest, though it stood in the name of another, and further by similarly failing to report the indebtedness of Heyden to Fabrik, as the same existed at the time of passage of the act.

The indebtedness referred to was that arising from accumulated profits

under the contract of October 1, 1905, and certain dividends on the Fabrik's shares of stock, and the defrauding complained of in the first count consisted in an agreement to prevent the United States from "capturing" this alien enemy property, by making false and misleading reports to the Alien Property Custodian, whereby the existence of such property (charged as exceeding $500,000 in value) would be concealed from that official.

Both defendants having been convicted on both counts, they took out this joint writ of error.

Frank J. Hogan, of Washington, D. C., Martin W. Littleton, of New York City, and Howard Ferris, of Cincinnati, Ohio, for plaintiffs in error.

William Hayward, U. S. Atty., of New York City (Harold Harper, Sp. Asst. Atty. Gen., of counsel), for the United States.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The substance of that part of the statute (40 Stat. 411) toward the violation of which the conspiracy alleged was directed is this: On and after October 6, 1917, it became the duty, inter alios, of the officers, directors, or agents of the Heyden to furnish to the Alien Property Custodian a list of all shares in the Heyden owned on February 3, 1917, by any person defined as an enemy in the act, and the definition included the Fabrik. Their further duty was to furnish a list of all cases in which the Heyden had reasonable cause to believe that any shares were on February 3, 1917, owned or were still owned by such enemy, although standing on the Heyden's books in the name of another. Similarly it was their statutory duty to furnish information as to any property, "beneficial or otherwise," held by them or in their custody or control, and so held for or on behalf of an enemy, and finally to inform the Custodian whether the Heyden was in any way indebted to an enemy. Section 7, p. 416.

The sixteenth section of the statute (page 425) rendered subject to indictment and punishment "whoever shall wilfully violate any of the provisions of this act or of any license, rule, or regulation issued thereunder, and whoever shall wilfully violate, neglect, or refuse to comply with any order of the President issued in compliance with" the statute; and the same section prescribes similar punishment for "any officer, director or agent of any corporation who knowingly participates in such violation." It is therefore obvious that the offense which the defendants were accused of conspiring to commit was created by sections 7 and 16 of the Trading with the Enemy Act.

The history of the Heyden as above recited reveals a business founded, developed, and owned by certain Germans, and such ownership and control rested not only on stock holdings, but upon a private contract of a singularly far-reaching nature. But the case for the prosecution was not based upon a literal denial or concealment by defendants of any part of the above history. It did rest upon certain occurrences which, by defendant's contention wholly severed Heyden from the Fabrik, and terminated the latter's position either as shareholder, "partner," or creditor; but these same occurrences the prosecution urged, and the jury necessarily found, to be but covers or disguises designed

to hide from the United States, after declaration of war against Germany, the still existing beneficial German interest in everything the Heyden owned or earned.

The vital trial facts were as follows:

The Fabrik, as its full name, Chemische Fabrik von Heyden A/G, proclaimed, represented the chemical discoveries of v. Heyden, especially that of economically making salicylic acid; before 1914, it had extended its operation to England, France, and Japan, as well as the United States. By 1915 it had lost all its above referred to foreign ventures except the American one, and had already become nervous about that.

Especially was it difficult to get the parent concern's wares to America, or the Heyden's products abroad, owing to Great Britain's control of the sea, and as early as October, 1915, Mr. Hodgskin as counsel was called upon to explain, or explain away, to the British Embassy the relation between the Fabrik and Heyden, and this he attempted to do by a letter verbally true, but marked by much suppressio veri. The most obvious difficulty, either in dealing or attempting to deal with British sea power, or in the event of hostilities between the United States and Germany, was the Fabrik's absolute stock ownership of Heyden, and before January, 1916, some suggestions as to transfer of that stock had been made, but who started the subject is not known. In the month given, Simon by wireless told Fabrik:

"Immediate decision needed. Recommend delivery of papers to Dresdner Bank. Further security through contract here."

On February 10, 1916, Simon again pressed the matter by this message:

"Propose depositing of papers jointly in Hodgskin's and my name. Guarantee security. Urgently request immediate answer."

Five days later the Fabrik replied:

"Intend transferring to American living here, wire what formalities necessary."

To which Simon replied forthwith:

"Your plan doubtful. Decline responsibility."

So far as known, communication from Fabrik to Heyden stopped at this point; but later, in April, 1916, one Kny, the father-in-law of Simon, furnished Hodgskin with $149,000, being the par value of Fabrik's 745 shares, the latter transmitted same to Dresdner Bank, with directions to pay it to Fabrik on delivery of the latter's share certificate, and ordered the bank to "hold the stock for my account" until it could safely be sent him, and on getting certificates to send back the word "Completed." This the bank never did, but by April 29th a new certificate had been issued to Hodgskin for 745 shares, and he had been elected president of Heyden Company. On May 4th an official of the Fabrik sent word to Simon by wireless: "Amount Dresdner Bank arrived."

As to the money obtained by Hodgskin from Kny, he stated to Kny in writing that he was not obliged to repay it personally; but, if he did

not pay, Kny was "to take the stock as payment for the loan. * *. * I knew you know the value of this stock, and you cannot lose anything on the transaction."

On May 16, 1916, Mr. Hodgskin addressed a letter to Fabrik and handed it to Simon, with request that he send it to Germany. In such letter he formally offered at any time within 18 months, and on payment of the amount in marks he had sent Dresdner Bank, together with 6 per cent. interest, "to deliver or retransfer to you, or to whomever you designate," the said 745 shares.

[1] Assuming legal validity in the interrelation of Kny, Hodgskin, and the Fabrik, and remembering that defendant was a competent and well-known lawyer, the situation speaks for itself, it was merely impossible; and from the whole story, of which the merest outline has been given, the jury certainly had evidence enabling them to find that the whole scheme of stock transfer was but a method of hiding from whom it might concern the fact that Fabrik was still the beneficial owner of the 745 shares, and that Simon and Hodgskin were such owner's faithful and devoted servants and attorneys in the premises.

There remained the Fabrik's interest in or claim upon the Heyden, based on the agreement of 1905. The American business was increasingly prosperous, and at a directors' meeting of the Heyden, held December 21, 1916, it was "resolved that the treasurer be directed to pay the amount of royalty and license fees as per the company's contract to the [Fabrik], amounting to $1,026,626.97," and according to the tax return of that corporation it had a surplus on January 1, 1917, of $598,-398.32. Meantime, and prior to October, 1916, Heyden had remitted to Fabrik by wireless "considerable sums of money," though exactly how much does not appear. Concerning these funds Mr. Hodgskin, as president of Heyden, wrote October 11, 1916, requesting Fabrik to "keep this money for our account, and as soon as shipping facilities are resumed between here and Germany we will wire or write exactly how we want these funds expended."

It was, upon the whole, plainly proven that according to the Heyden's record it was indebted to Fabrik on February 3, 1917, in an amount that could not have been less than $500,000, which sum is fixed upon because at that date whatever the Heyden called surplus belonged to the Fabrik under the agreement of 1905. This status continued long after the declaration of war on April 6, 1917, and until after the passage on October 6th of the Trading with the Enemy Act.

In September, 1917, a firm of accountants called the attention of Mr. Simon to the pendency of the legislation which ultimately became the Trading with the Enemy Act. Simon acknowledged receipt of the letter calling attention to the statute which "might affect our business," and said that "as soon as the act becomes a law we shall take legal advice in regard to the action we may have to take in order to comply with its provisions." What was done was that on November 13, 1917, Simon, as an officer of Heyden, wrote a letter, which was submitted to Mr. Hodgskin's senior partner, a well-known member of the bar. In this Simon called attention to the agreement of 1905, set forth that the Fabrik had failed to maintain the investment of about $250,000 referred

to in that contract, and had also failed to furnish "other patents and manufacturing processes" as provided for in said contract. The failure of the Fabrik to furnish additional processes was said by Mr. Simon to have "resulted in very considerable loss of profits to us" (meaning the Heyden).

On this letter the opinion of counsel was that the contract of 1905 might be annulled by the Heyden, which would then have the right to "apply any moneys which might be coming to [Fabrik] toward reimbursing you for the damages which you have sustained." Upon receipt of this professional opinion the Heyden directors resolved on December 18, 1917, that said contract "be annulled, canceled, and abrogated as of December 31, 1916, and that as soon as communication can be established between the United States and Germany formal notice of such cancellation, annulment, and abrogation be transmitted to" the Fabrik. This directors' resolution is recited to be in accord with a vote of the stockholders "passed at a meeting held in September, 1917," at which time Mr. Hodgskin held of record 744 out of 750 shares; he having transferred 1 share to Mr. Kny.

Throughout the trial defendants offered no evidence, although an examination of Simon by a representative of the Alien Property Custodian was offered by the prosecution and accepted without objection. In respect of the Heyden's action in attempting to cancel the contract of 1905 and appropriate to itself by way of compensation for lost profits (when such profits would have belonged almost wholly to Fabrik) the trial judge (Mack, C. J.) refused to pass upon its legal validity, but held and charged that the declaration of war had ipso facto abrogated the contract between the German and New Jersey corporations, but that such abrogation did not affect or destroy the then accrued rights of the Fabrik under such abrogated agreement. He therefore instructed the jury (in substance) that it was for them to say whether at the time war terminated the contract Heyden was indebted to Fabrik; and this ruling has not been assigned as error.

[2] Again we have given but an outline of the testimony regarding the alleged extinguishment of Fabrik's undoubted claim; but, starting with the opinion previously expressed, that defendants had already done their best to conceal the Fabrik's stock interest, we are further convinced that there was ample testimony from which a jury might find that the whole scheme of pretended extinguishment and appropriation of the Fabrik's claim was but a part of the same fidelity to their salt which had characterized defendants' treatment of Fabrik's stock.

In December, 1917, the Heyden made report, verified by Mr. Hodgskin as president, to the Alien Property Custodian, the effect of which was to acknowledge that it had two German shareholders, each holding one share of stock, and that no other alien enemies were shareholders, either in name or in effect, nor was it in any way indebted to any enemy alien, and that this condition of affairs had continuously existed from February 3, 1917. Insisting on the undoubted truths that Mr. Hodgskin's assumption of the position of Heyden's principal shareholder had occurred long before declaration of war, or even cessation of diplomatic relations with Germany, and that the New Jersey corporation's

abrogation of contract and appropriation of everything earned there-under by Fabrik had been dated back to a time anterior to February 3, 1917, defendants' major or fundamental proposition before this court is that their motion for a direction of verdict should have been granted because what they did, when they did it, did not amount to a crime, in that it was not unlawful when done, was done in good faith, and at the very worst was and is capable of an innocent interpretation.

[3] While noting that such contentions are usually more appropriate before a jury, they amount to no more than argument that nothing was done willfully or with criminal intent. The conspiracy statute (section 37) does not use the word "willfully." The Trading, etc., Act does, and we are willing therefore to assume (it is not necessary to decision) that, when any agreement was made to commit an offense against the United States, since the offense contained the element of willfulness, the conspiracy must contain the same element.

The general meaning of "willful" in criminal statutes is declared in Spurr v. United States, 174 U. S. 734, 19 Sup. Ct. 815, 43 L. Ed. 1150, thus:

"Doing or omitting to do a thing knowingly and willfully implies not only a knowledge of the thing, but a determination with a bad intent to do it or to omit doing it."

The meaning of "bad intent" will, however, depend very largely on whether the matter prescribed by statute or common law is malum pro-hibitum or malum in se. Accordingly it was well ruled in United States v. Sioux City, etc., Co. (C. C.) 162 Fed. at 562, that:

"If the forbidden act is not wrong in itself, or does not involve moral turpi-tude, the word [willfully] is then often used in the sense of intentionally, or purposely, and when the act is so done it is done willfully within the meaning of the statute." (Other cases there referred to.)

We shall not inquire, even after a war wherein the advantages of economic resources were so singularly manifest, whether the act or intent of secreting the wealth of an enemy from the power of one's own sovereign is an act of moral turpitude, or merely one prohibited. It is at least plain that the prohibition became imperative and insistent on October 6, 1917. Thus the inquiry is apt: What, according to the evidence, was the state of mind of those defendants when the Trading, etc., Act became law? We regret our inability to reach any other con-clusion than that the jury might well have found, as it did in effect, that their intent, and indeed determined purpose, was the preservation and protection of the Fabrik's interest in the Heyden from all enemies of Germany, including the United States.

It made no difference how unrelated to any existing criminal statute had been the stock transaction of 1916, if that was no more than a concealment, a part of the purpose just described, nevertheless these defendants were at once confronted with the imperative duty of in-forming the Custodian of the bald fact that Fabrik was the beneficial stockholder. That an inference of guilt could properly be drawn un-der the indictment and the statutes is too plain to require comment.

[4] It is specifically here objected that error was committed in show-ing what Mr. Hodgskin did in 1915 in respect of trying to get goods

past the British sea power. In this we discover no error, for it was not only legitimate, but essential, to establish defendants' general plan or purpose, above adverted to, of protecting Fabrik's interest in Heyden and concealing Heyden's relations with Fabrik from the enemies generally of Germany and Germans; and the defendants' efforts by suppression of truth, if not the suggestion of falsehood, to convince one particular enemy of Germany that Heyden was not German-owned and German-controlled, was relevant and material evidence of long established purpose and intent. Schultz v. United States, 200 Fed. 234, 237, 118 C. C. A. 420.

[5] Reversal is next demanded because, as against Simon only, there was admitted evidence that he had caused the destruction of a certain letter press copy book containing records of communications with Fabrik. It never appeared what those communications were. This objection would have great weight, if any probative effect were alleged in respect of anything contained in this book; but the evidence of destruction was not offered nor admitted for any such purpose, and the fact of destruction was relevant to show a course of conduct on the part of Simon, showing a consciousness of guilt, in the sense of attempting to hide all evidence of communication between Heyden and Fabrik. It is true that, when confronted with the Custodian's demand for information, Simon told (so far as we can see, quite frankly) his share in most of the transactions hereinbefore narrated. But the question was one for the jury, and both his earlier destruction of records and his later frankness went to the jury and were duly considered.

[6] It appeared in evidence that, when an agent of the Custodian examined into the affairs of Heyden, he as matter of fact seized the entire concern and practically all its share stock, and the trial judge over objection permitted testimony to the effect that Mr. Hodgskin had never filed any claim under the statute for the return of the stock standing in his name. This is assigned for error, but we are of opinion that the testimony is a plain instance of conduct tending to show consciousness of guilt and lack of faith in the truthfulness of such party's own assertion. Wigmore, vol. 2, § 1072.

[7] In addressing the jury the prosecutor said:

"Part of the defense here is that Simon was disloyal to his German employers. That is what it means. Look at him, gentlemen. Do you think that of this Prussian?"

Thereupon the defense objected to characterizing Simon as a Prussian; whereupon the prosecutor said, "German, if you like," and continued:

"All right, I say German now, and object very much to being interrupted. I say he is a Prussian, because he looks like one; he is in evidence before this jury."

The defense thereupon moved that the jury be instructed to disregard what had been said, as it was an "absolutely improper statement," and to this the court acceded. Later the prosecutor, adverting again to the hypothesis that Simon had not been loyal to his German employers, said of that defendant:

"Loyalty is his middle name. Loyalty to the Chemische Fabrik von Heyden, loyalty to Germany, loyalty to the Fatherland, loyalty to Hohenzollern. That was the loyalty which prevented him being faithless to his German employers while our country was at war with his."

The record shows no exception taken in respect of this matter, which is now asserted as ground of reversal. So far as the truth of these suggestions with regard to the defendant Simon is concerned, the foregoing opinion shows that we regard the evidence as fully proving that Simon was loyal and devoted to his employers, and that he did place their pecuniary security above every other suggested consideration.

We have not before us the entire address for the prosecution; the selection of isolated sentences of oratory furnishes a very dangerous ground for judicial action. It is, we think, enough to refer to our decision in Horowitz v. United States, 262 Fed. 48, for an instance of quite as inflammatory suggestion as is here complained of, while, having regard to the circumstances of this case as we perceive them, the recent discussion of this general subject in People v. Sicks, 299 Ill. 282, 132 N. E. 573, is very applicable.

We have considered this case at unusual length, being impressed with the feeling that in the motive of defendants, there might be found something to negative the intent so plainly inferable from their admitted deeds. The more the record is studied, the plainer it is that one thing overshadowed in defendants' minds everything else, for the declaration of war, statutes of seizure, efforts to injure an enemy because enmity existed, were all as nothing compared with the obligations of professional duty and long, and doubtless kindly, employment. It is true that these defendants were loyal above everything to the Chemische Fabrik von Heyden, and they could not accomplish the result desired by that kind of loyalty consistently with obedience to the statutes which are the basis of this indictment.

[8] The sentence was severe, but that is not reviewable in this court. Voege v. United States (C. C. A.) 270 Fed. 219.

Finding no error in the record, the judgments are affirmed.

MANTON, Circuit Judge, dissents.