**UNITED STATES v. VON CLEMM**
**et al.**
**No. 161.**

Circuit Court of Appeals, Second Circuit.
July 14, 1943.

Corbin & Bennett, of New York City (Harold H. Corbin and Edward J. Bennett, both of New York City, of counsel), for appellants.

Mathias F. Correa, U. S. Atty., of New York City (John F. Sonnett, Executive Asst. U. S. Atty., and Bruno Schachner, Asst. U. S. Atty., both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

SWAN, Circuit Judge.

The appellants were convicted under 18 U.S.C.A. § 88 of engaging in an unlawful conspiracy. Each was fined $10,000 and the individual appellant was sentenced to imprisonment for two years. The indictment contained but a single count. In brief, it charged that the appellants, and other defendants as to whom a severance was had at the opening of the trial, conspired to bring to this country diamonds that were cut in Holland or Belgium under false declarations that they were cut in Germany, which would be in violation of 18 U.S.C.A. § 80 and 19 U.S.C.A. § 1591, and to cause the diamonds to be paid for without securing the requisite license therefor, which would be in violation of 12 U.S.C.A. § 95a and Executive Order May 10, 1940, No. 8405, 12 U.S.C.A. § 95 note. Von Clemm took the stand and testified at great length in his own defense. It took the jury only an hour to reach their verdict finding both defendants guilty. The appellants present as their principal contentions the insufficiency of the evidence and the unconstitutionality of Executive Order No. 8405 and the legislation pursuant to which it was issued. Alleged errors in the conduct of the trial are also urged.

Appellant Von Clemm, a native of Germany, is a naturalized citizen of the United

States who has resided here since 1922. After a variety of business ventures he organized in 1938, under the laws of New York, the corporate appellant. His purpose was to import goods from Germany and thereby find a profitable way to use "blocked funds," which under German exchange regulations could be used to pay in part for goods to be exported. The stock of Pioneer was issued to International Mortgage & Investment Corporation, a Maryland corporation, which had large holdings of German blocked funds and put up 100,000 blocked marks as its contribution to the enterprise. Von Clemm advanced cash for Pioneer's working capital. He was its president and managed its business in this country. Pioneer's purchasing agent in Germany was International Mortgage Handelsgesellschaft, G.m.b.H., for brevity called Imico.[1] Shortly before the war broke out Von Clemm went to Germany and secured from a German official named Cremer, mentioned as a coconspirator in the indictment, permits for the exportation of several kinds of merchandise, including synthetic and semi-precious stones. By March, 1940, the British blockade made virtually impossible the shipment of bulky merchandise. In April, 1940, Von Clemm was sounded out by his brother, writing from Europe, with reference to handling diamonds. He responded asking for more details, and on May 21st wrote to his brother that "The recent Rotterdam developments should make it interesting for us to enter the diamonds picture * * * Please discuss with Cremer."[2] June 3rd Pioneer cabled Imico for quotations on "Rotterdam diamonds." In response Imico sent a list of diamonds and asked Pioneer to get in touch with the trade and give prices. The letter stated that "The Reichs Economics Ministry and The Stone Control Board want to do business with us and you." There was also enclosed in Imico's letter a communication addressed to Werner Senn in Milwaukee, which identified the owner of the listed diamonds as "a very large Dutch concern." After further correspondence the appellants received a packet of diamonds which they entered at the customs as of German origin. Their offer of $42,000 for the diamonds was accepted by the Reichs Economics Ministry and they paid this sum to the Guaranty Trust Company for credit to the account of Reichs-Kredit-Gesellschaft A.G., Berlin. Subsequently Von Clemm took elaborate precautions to destroy or conceal evidence tending to prove that these diamonds were of Dutch origin. He mutilated and falsified his files and enlisted the ready cooperation of his German associates to supply untrue information regarding missing correspondence. His efforts were fully exposed at the trial and the jury was properly instructed with respect to destruction or fabrication of evidence as indicative of guilt.[3]

Other evidence tended to prove the charge of conspiracy with respect to Belgian diamonds, although no actual shipment to the appellants was shown. In the autumn of 1940 Von Clemm talked with the witness Granovsky about a letter the latter had received from an Antwerp diamond dealer. Von Clemm told Granovsky that the diamonds could be sent to Germany and shipped from there. In reporting this interview to Imico Von Clemm wrote: "We would not dare to make anything but a German declaration. The other would undoubtedly be subject to license. It is essential that your diamond invoices show the notation 'cut in Germany.'" The office copy of this memorandum was destroyed and an innocuous substitute placed in Pioneer's files, but a copy of the original intercepted by British censors served to expose the substitution. Other witnesses testified to interviews with Cremer in Antwerp which tended to implicate the appellants circumstantially. Thus a Belgian diamond dealer named Klein was ordered by Cremer to get in touch with his American connections to negotiate sales which would be handled through Imico. And a Mrs. Rubin who desired to ship diamonds from Antwerp to her husband in the United States was instructed by Cremer to cable the husband for payment. Her cable was brought to Von Clemm's office, and the payment requested was made by

---

[1] Imico's manager was Carlos Hoepfner, named as a co-defendant in the indictment; he was a vice-president of Pioneer until 1941. Another defendant, Carl Von Clemm, who is a brother of the appellant Werner Von Clemm, was also connected with Imico.

[2] The Lowlands were invaded by Germany on May 10, 1940. Cremer became Commissioner for Belgian Diamond Export.

[3] See Wilson v. United States, 162 U. S. 613, 621, 16 S.Ct. 895, 40 L.Ed. 1090; Hodgskin v. United States, 2 Cir., 279 F. 85, 93; United States v. Graham, 2 Cir., 102 F.2d 436, 442.

Pioneer to Imico. The code designation used by Pioneer in making payment was the same as that which Cremer had ordered Mrs. Rubin to put upon the package in Antwerp, implying prearranged collaboration. Evidence was also given of the following somewhat similar transaction: In December, 1940, Von Clemm was requested to offer Antwerp diamonds to a New York diamond merchant, a partial advance payment being required. Von Clemm had Pioneer make the advance payment personally and cabled Imico to "rush all available diamonds" to Pioneer.

■ In the light of the evidence above summarized it seems little short of effrontery for the appellants to argue that the jury's verdict is not supportable. Rarely have we seen a case where an illegal conspiracy was so clearly inferable from proven facts or where the accused were so completely enmeshed in a web of their own making. Von Clemm's concealment and fabrication of evidence can leave no doubt whatever of his guilt.

■ We pass now to the constitutional question raised by the appellants with respect to Executive Order 8405 and the legislation pursuant to which it was issued. This order amended Executive Order No. 8389, dated April 10, 1940, 12 U.S.C.A. § 95 note, which prohibited, except under licenses issued by the Secretary of the Treasury, transactions in foreign exchange involving property of Norway or Denmark or any national of either after those countries were invaded by Germany. The amendment extended the same prohibition to Holland, Belgium and Luxembourg and their nationals on or after May 10, 1940. The appellants contend that the statutes under which the orders were issued constitute an illegal delegation of authority to the President. It is true that the statute, 12 U.S.C.A. § 95a, in effect when the first "freezing" order of April 10, 1940 was issued, gave the Executive unlimited discretion during any "period of national emergency declared by" him to regulate or prohibit transactions in foreign exchange. As no standard was prescribed to guide him in the exercise of the power delegated, the appellants urge that the test established in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 and Schechter Poultry Corp. v. United States, 295 U. S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A. L.R. 947, was not met. When Order No. 8405 of May 10, 1940 was issued Congress had passed the Joint Resolution of May 7, 1940, 54 Stat. 179, section 2 of which provided: "Executive Order Numbered 8389 of April 10, 1940, and the regulations and general rulings issued thereunder by the Secretary of the Treasury are hereby approved and confirmed."

Before considering specifically what effect should be accorded this congressional approval and confirmation of the first freezing order, we note that the constitutionality of Executive Orders under these statutes has often been assumed by courts of the highest authority. Perry v. United States, 294 U.S. 330, 335, 55 S.Ct. 432, 79 L.Ed. 912, 95 A.L.R. 1335; Norman v. Baltimore & O. R. Co., 294 U.S. 240, 295, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352; Commission of Polish Relief v. Banca Nationala a Rumaniei, 288 N.Y. 332, 336, 43 N.E.2d 345. The legislation has twice come before this court without its constitutionality being questioned. Uebersee Finanz-Korporation v. Rosen, 2 Cir., 83 F.2d 225, 228; British Am. Tobacco Co. v. Federal Reserve Bank, 2 Cir., 104 F.2d 652, 653, on rehearing 2 Cir., 105 F.2d 935, certiorari denied 308 U.S. 600, 60 S.Ct. 131, 84 L.Ed. 502. And the same argument now made by the appellants was rejected by Judge Woolsey in Campbell v. Chase Nat. Bank, D.C., S.D.N.Y., 5 F.Supp. 156, 172, affirmed, 2 Cir., 71 F.2d 669, certiorari denied 293 U.S. 592, 55 S.Ct. 108, 79 L.Ed. 686. Moreover, there is much persuasive force in the appellee's argument that the power exerted by the Executive with regard to property of foreign nationals in a time of proclaimed emergency falls within the sphere of foreign relations and is thus free from the limitations imposed on delegated authority. See Hamilton v. Dillin, 88 U.S. 73, 22 L. Ed. 528; United States v. Belmont, 301 U. S. 324, 57 S.Ct. 758, 81 L.Ed. 1134; United States v. Curtis-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255; United States v. Pink, 315 U.S. 203, 62 S. Ct. 552, 86 L.Ed. 796. But whatever the result might be in the absence of section 2 of the Act of May 7, 1940, we hold that this retroactive approval and confirmation of the President's order removed all question of improper delegation with regard to Order 8389 and provided an adequate standard and guide for his exercise of discretion in Order No. 8405. The latter merely extended to new subject matter, upon facts warranting the extension, a set of regulations already approved by Congress. A clearer example of that guidance

required by the Panama and Schechter cases would be difficult to imagine.

The remaining questions raised by the appellants require but brief discussion. Complaint is made that the witnesses Rubin and Klein were permitted to testify as to conversations and dealings with Cremer in Antwerp. The competency of Cremer's declarations depends upon whether, independently of them, there was evidence from which the trial judge could conclude that Von Clemm and Cremer were acting in concert for the importation of diamonds. Such evidence was ample. The first communication about diamonds from Von Clemm's brother mentioned that Cremer "wishes you to handle the diamonds line." Von Clemm's letter of May 21 requested the brother to discuss "the diamond picture" with Cremer. Five months later Cremer attached to Klein's letter to Elkon a tissue slip directing payment to be made to Imico and giving as the cable address Pioneer's Berlin office. These documents can leave little doubt that when Cremer directed the transaction to be cleared through the appellants, he did so with their consent. In passing upon whether a sufficient showing has been made to render competent the acts and declarations of a coconspirator, the trial court has much discretion and its rulings are not to be lightly disturbed. Delaney v. United States, 263 U.S. 586, 590, 44 S.Ct. 206, 68 L.Ed. 462; Wiborg v. United States, 163 U.S. 632, 658, 16 S.Ct. 1127, 1197, 41 L.Ed. 289. We see no reason to doubt their correctness in the case at bar.

Error is assigned to the court's refusal to postpone the trial until after termination of the war. The argument proceeds upon the assumption that evidence may be available in Germany which would be favorable to the accused if it could be found and produced. The recognition of such a doctrine would mean that every violator of our laws—whether he be an alien or a naturalized citizen like Von Clemm—would be immune from prosecution during time of war by merely asserting that witnesses abroad could prove his innocence of the charge. A mere statement of the proposition shows the impossibility of its acceptance. Nor in the case at bar is it likely that any evidence could be produced of a character to change the verdict; for the readiness of Von Clemm's German associates to fabricate evidence was so thoroughly established that any testimony they might give would probably be discredited by the jury.

As to errors assigned in respect to the charge and refusal of requests to charge it will suffice to say that we find them without merit.

Judgment affirmed.