UNITED STATES of America, Plaintiff,

v.

Oscar WAGMAN, Defendant.

United States District Court
S. D. New York.
Dec. 10, 1958.

Arthur H. Christy, U. S. Atty., New York City, by Anthony R. Palermo, Rochester, N. Y., and Edwin F. Rains, Washington, D. C., Chief Counsel, Foreign Assets Control, for plaintiff.

Joseph W. Burns, New York City, for defendant.

EDELSTEIN, District Judge.

Defendant has moved to dismiss a two count indictment under the Trading with the Enemy Act, 40 Stat. 415, as amended, Title 50 U.S.C.Appendix, § 5(b), 50 U.S.C.A.Appendix, § 5(b), and the applicable regulations. Section 5(b) of the Act authorizes the President or his designate, during time of war or other period of national emergency, to regulate or prohibit transactions with any foreign country or its nationals.[1] Since December 17, 1950, the Foreign Assets Control Division of the Treasury Department has been the agency charged with the administration of these powers. After the outbreak of the Korean conflict, the Secretary of the Treasury promulgated Foreign Assets Control Regulations, 31 CFR § 500.101 et seq. Section 500.204 provides that except as authorized by a government license, "no person subject to the jurisdiction of the United States may purchase, transport, import or otherwise deal in or engage in any transaction with respect to any merchandise outside the United States if such merchandise is * * *

---

[1]. § 5(b) (1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property, subject to the jurisdiction of the United States * * *."

[m]erchandise the country of origin of which is China * * *."

One of the commodities included within the meaning of this regulation is Chinese hog bristle. Count one of the indictment charges that the defendant "did transmit money" to a Canadian company "for the purpose of partially financing purchases of Chinese hog bristles" from a company in Amsterdam, Holland, "without such dealings being specifically authorized by the Secretary of the Treasury * * *" Count two charges the defendant with a conspiracy to purchase Chinese hog bristles.

 The first ground advanced for dismissal, that no competent evidence was presented before the grand jury which returned the indictment, inspires not even a pause, under Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397. The second ground is that the indictment fails to state an offense. An offense is certainly stated by the second count, under the conspiracy statute, 18 U.S.C. § 371, the object of the conspiracy being a purchase specifically prohibited by the quoted regulation. But the defendant contends that the first count, charging a transmission of money "for the purpose of partially financing purchases of Chinese hog bristles", seeks to make him answer merely for harboring an illegal intent. It is perfectly obvious, however, that he is charged with having purposely engaged in an illegal transaction, the transmission of money abroad to finance certain purchases. But it is further argued that the language of the regulation does not cover such a transaction. The doctrine of *ejusdem generis* is invoked to limit the meaning of the general terms "deal in" and "engage in" which follow the specific terms "purchase, transport, import", to the significance of a quality of possession or right in the merchandise involved. The argument is unconvincing. As the Supreme Court stated in Gooch v. United States, 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522:

"The rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty. Ordinarily, it limits general terms which follow specific ones to matters similar to those specified; but it may not be used to defeat the obvious purpose of legislation. And, while penal statutes are narrowly construed, this does not require rejection of that sense of the words which best harmonizes with the context and the end in view."

The obvious purpose of the legislation and regulations here in issue is to deprive Communist China of economic benefits. There can be no uncertainty that the financing of purchases of merchandise originating in Communist China, as here charged, is within the meaning of the language of the regulation, harmonizing with the context and the end in view. To hold otherwise would be to defeat the obvious purpose. Moreover, even under the doctrine of *ejusdem generis*, the financing of purchases comes well within a limited meaning of "purchase * * * or otherwise deal in or engage in any transaction with respect to any merchandise * * *." I hold that count one of the indictment adequately states an offense under 31 CFR § 500.204.

 Assuming this conclusion, the defendant maintains that the indictment must fall because the regulation stating such an offense is not authorized by section 5(b) of the Trading with the Enemy Act. Straining the language of section 5(b) (1) (B) for an ambiguity, defendant cites legislative history for the proposition that the clear intent of Congress was merely to set up machinery for the sequestration of alien or enemy property within the country, and that any attempt to use section 5(b) to prevent American citizens from trading commercially with Communist China is a use not contemplated by Congress. But the legislative history cited is that occurring upon the enactment of the last amendment to the statute in 1941, it having been originally enacted in 1917 and subsequently amended in 1918, 1933, 1940, and 1941. There

is no doubt that at the time of the 1941 amendment Congress was principally concerned with the problems surrounding alien property. It considerably broadened the powers of the President to take, administer, control, use and liquidate foreign owned property and added a flexibility of control which enabled the President and agencies designated by him to cope with these problems. But there is nothing whatever to indicate that any previously delegated power was withdrawn or contracted. Prior to the 1940 amendment by the Joint Resolution of May 7, 54 Stat. 179, regulations were issued under Executive Order 8389 of April 10, 1940, 12 U.S.C.A. § 95a note, and administered by the Treasury Department's Foreign Funds Control. The Order prohibited, except under licenses issued by the Secretary of the Treasury, transactions in foreign exchange involving the property of Norway or Denmark or any national of either after those countries were invaded by Germany in World War II. Section 2 of the Joint Resolution passed a month later provided: "Executive Order Numbered 8389 of April 10, 1940, and the regulations and general rulings issued thereunder by the Secretary of the Treasury are hereby approved and confirmed." The Foreign Funds Control Regulations were used during World War II to an effect similar to that for which the Foreign Assets Control Regulations have been used since the Korean conflict. See United States v. Von Clemm, 2 Cir., 136 F.2d 968, certiorari denied 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459. There can be no question that even before the 1941 amendment, section 5(b) delegated authority to the Executive to exert power over property of foreign nationals in a time of proclaimed emergency, and it now specifically so provides. It clearly and unambiguously authorizes the regulation and prohibition of transactions involving such property with any foreign country or its nationals, and the regulation effecting the prohibition of trade in Chinese hog bristles is clearly valid.

Assuming the validity of the regulation under the statute, the defendant next contends that they are unconstitutional for vagueness "as applied to the facts in this case", referring, presumably, to the charge in count one. Actually this is a repetition of the argument that financing of purchases is not specifically prohibited in so many words, and that the regulation cannot fairly be held to contain such a prohibition. But it is difficult to understand how the regulation could fairly be held not to contain such a prohibition. Given the purpose of the regulation under the statute, to prohibit purchases and except the financing of purchases from the prohibition of otherwise dealing in or engaging in transactions involving the specified merchandise would be to subvert the end sought.

Finally, the defendant urges that the indictment should be dismissed because a finding of willfullness would not be authorized. Suffice it to say that this is a matter that can be determined only after a trial.

The motion to dismiss is denied.