## PERRY *v.* UNITED STATES.*

No. 532. Argued January 10, 11, 1935.—Decided February 18, 1935.

---

* See note, p. 240.

332

*Mr. John M. Perry, pro se. Mr. Hersey Egginton* was with him on the brief.

334

336

338

340

*Mr. Angus MacLean,* Assistant Solicitor General, opened the argument for the United States in this case. *Attorney General Cummings* made a closing argument for this and the two preceding cases. Those who were with them on the Government's brief were *Solicitor General Biggs, Assistant Attorney General Sweeney,* and *Messrs. Alexander Holtzoff* and *Harry LeRoy Jones.* The brief is here summarized:

344

By leave of Court, *Messrs. Edward E. Gann* and *George C. Johnson* filed a brief as *amici curiae* in support of the contentions of the United States.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The certificate from the Court of Claims shows the following facts:

Plaintiff brought suit as the owner of an obligation of the United States for $10,000, known as " Fourth Liberty Loan 4¼% Gold Bond of 1933–1938." This bond was issued pursuant to the Act of September 24, 1917 (40 Stat. 288), as amended, and Treasury Department circular No. 121, dated September 28, 1918. The bond

provided: " The principal and interest hereof are payable in United States gold coin of the present standard of value."

Plaintiff alleged in his petition that at the time the bond was issued, and when he acquired it, a dollar in gold consisted of 25.8 grains of gold .9 fine "; that the bond was called for redemption on April 15, 1934, and, on May 24, 1934, was presented for payment; that plaintiff demanded its redemption " by the payment of 10,000 gold dollars each containing 25.8 grains of gold .9 fine "; that defendant refused to comply with that demand, and that plaintiff then demanded " 258,000 grains of gold .9 fine, or gold of equivalent value of any fineness, or 16,931.25 gold dollars each containing 15 5/21 grains of gold .9 fine, or 16,931.25 dollars in legal tender currency "; that defendant refused to redeem the bond " except by the payment of 10,000 dollars in legal tender currency "; that these refusals were based on the Joint Resolution of the Congress of June 5, 1933 (48 Stat. 113), but that this enactment was unconstitutional as it operated to deprive plaintiff of his property without due process of law; and that, by this action of defendant, he was damaged " in the sum of $16,931.25, the value of defendant's obligation," for which, with interest, plaintiff demanded judgment.

Defendant demurred upon the ground that the petition did not state a cause of action against the United States.

The Court of Claims has certified the following questions:

"1. Is the claimant, being the holder and owner of a Fourth Liberty Loan 4¼% bond of the United States, of the principal amount of $10,000, issued in 1918, which was payable on and after April 15, 1934, and which bond contained a clause that the principal is 'payable in United States gold coin of the present standard of value,' entitled to receive from the United States an amount in legal tender currency in excess of the face amount of the bond?

" 2. Is the United States, as obligor in a Fourth Liberty Loan 4¼% gold bond, Series of 1933–1938, as stated in Question One, liable to respond in damages in a suit in the Court of Claims on such bond as an express contract, by reason of the change in or impossibility of performance in accordance with the tenor thereof, due to the provisions of Public Resolution No. 10, 73rd Congress, abrogating the gold clause in all obligations? "

*First. The import of the obligation.* The bond in suit differs from an obligation of private parties, or of States or municipalities, whose contracts are necessarily made in subjection to the dominant power of the Congress. *Norman* v. *Baltimore & Ohio R. Co.*, decided this day, *ante*, p. 240. The bond now before us is an obligation of the United States. The terms of the bond are explicit. They were not only expressed in the bond itself, but they were definitely prescribed by the Congress. The Act of September 24, 1917, both in its original and amended form, authorized the moneys to be borrowed, and the bonds to be issued, "on the credit of the United States" in order to meet expenditures needed " for the national security and defense and other public purposes authorized by law." 40 Stat. 288, 503. The circular of the Treasury Department of September 28, 1918, to which the bond refers "for a statement of the further rights of the holders of bonds of said series," also provided that the principal and interest "are payable in United States gold coin of the present standard of value."

This obligation must be fairly construed. The *"present* standard of value" stood in contradistinction to a *lower* standard of value. The promise obviously was intended to afford protection against loss. That protection was sought to be secured by setting up a standard or measure of the Government's obligation. We think that the reasonable import of the promise is that it was intended

to assure one who lent his money to the Government and took its bond that he would not suffer loss through depreciation in the medium of payment.

The Government states in its brief that the total unmatured interest-bearing obligations of the United States outstanding on May 31, 1933, (which it is understood contained a " gold clause " substantially the same as that of the bond in suit,) amounted to about twenty-one billions of dollars. From statements at the bar, it appears that this amount has been reduced to approximately twelve billions at the present time, and that during the intervening period the public debt of the United States has risen some seven billions (making a total of approximately twenty-eight billions five hundred millions) by the issue of some sixteen billions five hundred millions of dollars " of non-gold-clause obligations."

*Second. The binding quality of the obligation.* The question is necessarily presented whether the Joint Resolution of June 5, 1933 (48 Stat. 113) is a valid enactment so far as it applies to the obligations of the United States. The Resolution declared that provisions requiring " payment in gold or a particular kind of coin or currency " were " against public policy," and provided that " every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein," shall be discharged " upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts." This enactment was expressly extended to obligations of the United States, and provisions for payment in gold, " contained in any law authorizing obligations to be issued by or under authority of the United States," were repealed.[1]

---

[1] And subdivision (b) of § 1 of the Joint Resolution of June 5, 1933, provided: "As used in this resolution, the term ' obligation ' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States;

There is no question as to the power of the Congress to regulate the value of money, that is, to establish a monetary system and thus to determine the currency of the country. The question is whether the Congress can use that power so as to invalidate the terms of the obligations which the Government has theretofore issued in the exercise of the power to borrow money on the credit of the United States. In attempted justification of the Joint Resolution in relation to the outstanding bonds of the United States, the Government argues that "earlier Congresses could not validly restrict the 73rd Congress from exercising its constitutional powers to regulate the value of money, borrow money, or regulate foreign and interstate commerce"; and, from this premise, the Government seems to deduce the proposition that when, with adequate authority, the Government borrows money and pledges the credit of the United States, it is free to ignore that pledge and alter the terms of its obligations in case a later Congress finds their fulfillment inconvenient. The Government's contention thus raises a question of far greater importance than the particular claim of the plaintiff. On that reasoning, if the terms of the Government's bond as to the standard of payment can be repudiated, it inevitably follows that the obligation as to the amount to be paid may also be repudiated. The contention necessarily imports that the Congress can disregard the obligations of the Government at its discretion and that, when the Government borrows money, the credit of the United States is an illusory pledge.

We do not so read the Constitution. There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority,

and the term 'coin or currency' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations."

and the power of the Congress to alter or repudiate the substance of its own engagements when it has borrowed money under the authority which the Constitution confers. In authorizing the Congress to borrow money, the Constitution empowers the Congress to fix the amount to be borrowed and the terms of payment. By virtue of the power to borrow money " *on the credit of the United States,*" the Congress is authorized to pledge that credit as an assurance of payment as stipulated,—as the highest assurance the Government can give, its plighted faith. To say that the Congress may withdraw or ignore that pledge, is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government.

The binding quality of the obligations of the Government was considered in the *Sinking-Fund Cases,* 99 U. S. 700, 718, 719. The question before the Court in those cases was whether certain action was warranted by a reservation to the Congress of the right to amend the charter of a railroad company. While the particular action was sustained under this right of amendment, the Court took occasion to state emphatically the obligatory character of the contracts of the United States. The Court said: " The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen." [2]

---

[2] Mr. Justice Strong, who had written the opinion of the majority of the Court in the legal tender cases (*Knox* v. *Lee,* 12 Wall. 457), dissented in the *Sinking-Fund Cases,* 99 U. S. p. 731, because he thought that the action of the Congress was not consistent with the Government's engagement and hence was a transgression of legislative

When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments. There is no difference, said the Court in *United States* v. *Bank of the Metropolis,* 15 Pet. 377, 392, except that the United States cannot be sued without its consent. See, also, *The Floyd Acceptances,* 7 Wall. 666, 675; *Cooke* v. *United States,* 91 U. S. 389, 396. In *Lynch* v. *United States,* 292 U. S. 571, 580, with respect to an attempted abrogation by the Act of March 20, 1933 (48 Stat. 8, 11) of certain outstanding war risk insurance policies, which were contracts of the United States, the Court quoted with approval the statement in the *Sinking-Fund Cases, supra,* and said: " Punctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors. No doubt there was in March, 1933, great need of economy. In the administration of all government business economy had become urgent because of lessened revenues and the heavy obligations to be issued in the hope of relieving widespread distress. Congress was free to reduce gratuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would

---

power. And with respect to the sanctity of the contracts of the Government, he quoted, with approval, the opinion of Mr. Hamilton in his communication to the Senate of January 20, 1795 (citing 3 Hamilton's Works, 518, 519), that " when a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent, with the same rights and obligations as an individual. Its promises may be justly considered as excepted out of its power to legislate unless in aid of them. It is in theory impossible to reconcile the idea of a promise which obliges, with the power to make a law which can vary the effect of it."

be not the practice of economy, but an act of repudiation."

The argument in favor of the Joint Resolution, as applied to government bonds, is in substance that the Government cannot by contract restrict the exercise of a sovereign power. But the right to make binding obligations is a competence attaching to sovereignty.[3] In the United States, sovereignty resides in the people, who act through the organs established by the Constitution. *Chisholm* v. *Georgia*, 2 Dall. 419, 471; *Penhallow* v. *Doane's Administrators*, 3 Dall. 54, 93; *McCulloch* v. *Maryland*, 4 Wheat. 316, 404, 405; *Yick Wo* v. *Hopkins*, 118 U. S. 356, 370. The Congress as the instrumentality of sovereignty is endowed with certain powers to be exerted on behalf of the people in the manner and with the effect the Constitution ordains. The Congress cannot invoke the sovereign power of the people to override their will as thus declared. The powers conferred upon the Congress are harmonious. The Constitution gives to the Congress the power to borrow money on the credit of the United States, an unqualified power, a power vital to the Government,— upon which in an extremity its very life may depend. The binding quality of the promise of the United States is of the essence of the credit which is so pledged. Having this power to authorize the issue of definite obligations for the payment of money borrowed, the Congress has not been vested with authority to alter or destroy those obli-

[3] Oppenheim, International Law, 4th ed., vol. 1, §§ 493, 494. This is recognized in the field of international engagements. Although there may be no judicial procedure by which such contracts may be enforced in the absence of the consent of the sovereign to be sued, the engagement validly made by a sovereign state is not without legal force, as readily appears if the jurisdiction to entertain a controversy with respect to the performance of the engagement is conferred upon an international tribunal. Hall, International Law, 8th ed., § 107; Oppenheim, *loc. cit.*; Hyde, International Law, vol. 2, § 489.

gations. The fact that the United States may not be sued without its consent is a matter of procedure which does not affect the legal and binding character of its contracts. While the Congress is under no duty to provide remedies through the courts, the contractual obligation still exists and, despite infirmities of procedure, remains binding upon the conscience of the sovereign. *Lynch* v. *United States, supra,* pp. 580, 582.

The Fourteenth Amendment, in its fourth section, explicitly declares: " The validity of the public debt of the United States, authorized by law, . . . shall not be questioned." While this provision was undoubtedly inspired by the desire to put beyond question the obligations of the Government issued during the Civil War, its language indicates a broader connotation. We regard it as confirmatory of a fundamental principle, which applies as well to the government bonds in question, and to others duly authorized by the Congress, as to those issued before the Amendment was adopted. Nor can we perceive any reason for not considering the expression " the *validity* of the public debt " as embracing whatever concerns the integrity of the public obligations.

We conclude that the Joint Resolution of June 5, 1933, in so far as it attempted to override the obligation created by the bond in suit, went beyond the congressional power.

*Third. The question of damages.* In this view of the binding quality of the Government's obligations, we come to the question as to the plaintiff's right to recover damages. That is a distinct question. Because the Government is not at liberty to alter or repudiate its obligations, it does not follow that the claim advanced by the plaintiff should be sustained. The action is for breach of contract. As a remedy for breach, plaintiff can recover no more than the loss he has suffered and of which he may rightfully complain. He is not entitled to be en-

riched. Plaintiff seeks judgment for $16,931.25, in present legal tender currency, on his bond for $10,000. The question is whether he has shown damage to that extent, or any actual damage, as the Court of Claims has no authority to entertain an action for nominal damages. *Grant* v. *United States,* 7 Wall. 331, 338; *Marion & R. V. Ry. Co.* v. *United States,* 270 U. S. 280, 282; *Nortz* v. *United States,* decided this day, *ante,* p. 317.

Plaintiff computes his claim for $16,931.25 by taking the weight of the gold dollar as fixed by the President's proclamation of January 31, 1934, under the Act of May 12, 1933 (48 Stat. 52, 53), as amended by the Act of January 30, 1934 (48 Stat. 342), that is, at 15 5/21 grains nine-tenths fine, as compared with the weight fixed by the Act of March 14, 1900 (31 Stat. 45), or 25.8 grains nine-tenths fine. But the change in the weight of the gold dollar did not necessarily cause loss to the plaintiff of the amount claimed. The question of actual loss cannot fairly be determined without considering the economic situation at the time the Government offered to pay him the $10,000, the face of his bond, in legal tender currency. The case is not the same as if gold coin had remained in circulation. That was the situation at the time of the decisions under the legal tender acts of 1862 and 1863. *Bronson* v. *Rodes,* 7 Wall. 229, 251; *Trebilcock* v. *Wilson,* 12 Wall. 687, 695; *Thompson* v. *Butler,* 95 U. S. 694, 696, 697. Before the change in the weight of the gold dollar in 1934, gold coin had been withdrawn from circulation.[4] The Congress had authorized the prohibition of the exportation of gold coin and the placing of restrictions upon transactions in foreign exchange. Acts of March 9, 1933,

---

[4] In its Report of May 27, 1933, it was stated by the Senate Committee on Banking and Currency: "By the Emergency Banking Act and the existing Executive Orders gold is not now paid, or obtainable for payment, on obligations public or private." Sen. Rep. No. 99, 73d Cong., 1st sess.

48 Stat. 1; January 30, 1934, 48 Stat. 337. Such dealings could be had only for limited purposes and under license. Executive Orders of April 20, 1933, August 28, 1933, and January 15, 1934; Regulations of the Secretary of the Treasury, January 30 and 31, 1934. That action the Congress was entitled to take by virtue of its authority to deal with gold coin as a medium of exchange. And the restraint thus imposed upon holders of gold coin was incident to the limitations which inhered in their ownership of that coin and gave them no right of action. *Ling Su Fan* v. *United States*, 218 U. S. 302, 310, 311. The Court said in that case: "Conceding the title of the owner of such coins, yet there is attached to such ownership those limitations which public policy may require by reason of their quality as a legal tender and as a medium of exchange. These limitations are due to the fact that public law gives to such coinage a value which does not attach as a mere consequence of intrinsic value. Their quality as a legal tender is an attribute of law aside from their bullion value. They bear, therefore, the impress of sovereign power which fixes value and authorizes their use and exchange. . . . However unwise a law may be, aimed at the exportation of such coins, in the face of the axioms against obstructing the free flow of commerce, there can be no serious doubt that the power to coin money includes the power to prevent its outflow from the country of its origin." The same reasoning is applicable to the imposition of restraints upon transactions in foreign exchange. We cannot say, in view of the conditions that existed, that the Congress, having this power, exercised it arbitrarily or capriciously. And the holder of an obligation, or bond, of the United States, payable in gold coin of the former standard, so far as the restraint upon the right to export gold coin or to engage in transactions in foreign exchange is concerned, was in no better case than the holder of gold coin itself.

In considering what damages, if any, the plaintiff has sustained by the alleged breach of his bond, it is hence inadmissible to assume that he was entitled to obtain gold coin for recourse to foreign markets, or for dealings in foreign exchange, or for other purposes contrary to the control over gold coin which the Congress had the power to exert, and had exerted, in its monetary regulation. Plaintiff's damages could not be assessed without regard to the internal economy of the country at the time the alleged breach occurred. The discontinuance of gold payments and the establishment of legal tender currency on a standard unit of value with which " all forms of money " of the United States were to be " maintained at a parity," had a controlling influence upon the domestic economy. It was adjusted to the new basis. A free domestic market for gold was non-existent.

Plaintiff demands the " equivalent " in currency of the gold coin promised. But " equivalent " cannot mean more than the amount of money which the promised gold coin would be worth to the bondholder for the purposes for which it could legally be used. That equivalence or worth could not properly be ascertained save in the light of the domestic and restricted market which the Congress had lawfully established. In the domestic transactions to which the plaintiff was limited, in the absence of special license, determination of the value of the gold coin would necessarily have regard to its use as legal tender and as a medium of exchange under a single monetary system with an established parity of all currency and coins. And in view of the control of export and foreign exchange, and the restricted domestic use, the question of value, in relation to transactions legally available to the plaintiff, would require a consideration of the purchasing power of the dollars which the plaintiff could have received. Plaintiff has not shown, or attempted to show, that in relation to buying power he has sustained any loss whatever. On

the contrary, in view of the adjustment of the internal economy to the single measure of value as established by the legislation of the Congress, and the universal availability and use throughout the country of the legal tender currency in meeting all engagements, the payment to the plaintiff of the amount which he demands would appear to constitute not a recoupment of loss in any proper sense but an unjustified enrichment.

Plaintiff seeks to make his case solely upon the theory that by reason of the change in the weight of the dollar he is entitled to one dollar and sixty-nine cents in the present currency for every dollar promised by the bond, regardless of any actual loss he has suffered with respect to any transaction in which his dollars may be used. We think that position is untenable.

In the view that the facts alleged by the petition fail to show a cause of action for actual damages, the first question submitted by the Court of Claims is answered in the negative. It is not necessary to answer the second question.

*Question No. 1 is answered " No."*

MR. JUSTICE STONE, concurring.

I agree that the answer to the first question is " No," but I think our opinion should be confined to answering that question and that it should essay an answer to no other.

I do not doubt that the gold clause in the Government bonds, like that in the private contracts just considered, calls for the payment of value in money, measured by a stated number of gold dollars of the standard defined in the clause, *Feist* v. *Société Intercommunale Belge d'Electricité,* [1934] A. C. 161, 170–173; *Serbian and Brazilian Bond Cases,* P. C. I. J., series A., Nos. 20–21, pp. 32–34, 109–119. In the absence of any further exertion of governmental power, that obligation plainly could not be

satisfied by payment of the same number of dollars, either specie or paper, measured by a gold dollar of lesser weight, regardless of their purchasing power or the state of our internal economy at the due date.

I do not understand the Government to contend that it is any the less bound by the obligation than a private individual would be, or that it is free to disregard it except in the exercise of the constitutional power " to coin money " and " regulate the value thereof." In any case, there is before us no question of default apart from the regulation by Congress of the use of gold as currency.

While the Government's refusal to make the stipulated payment is a measure taken in the exercise of that power, this does not disguise the fact that its action is to that extent a repudiation of its undertaking. As much as I deplore this refusal to fulfill the solemn promise of bonds of the United States, I cannot escape the conclusion, announced for the Court, that in the situation now presented, the Government, through the exercise of its sovereign power to regulate the value of money, has rendered itself immune from liability for its action. To that extent it has relieved itself of the obligation of its domestic bonds, precisely as it has relieved the obligors of private bonds in *Norman* v. *Baltimore & Ohio R. Co.*, decided this day, *ante*, p. 240.

In this posture of the case it is unnecessary, and I think undesirable, for the Court to undertake to say that the obligation of the gold clause in Government bonds is greater than in the bonds of private individuals, or that in some situation not described, and in some manner and in some measure undefined, it has imposed restrictions upon the future exercise of the power to regulate the currency. I am not persuaded that we should needlessly intimate any opinion which implies that the obligation may so operate, for example, as to interpose a serious obstacle to the adoption of measures for stabilization of

the dollar, should Congress think it wise to accomplish that purpose by resumption of gold payments, in dollars of the present or any other gold content less than that specified in the gold clause, and by the re-establishment of a free market for gold and its free exportation.

There is no occasion now to resolve doubts, which I entertain, with respect to these questions. At present they are academic. Concededly they may be transferred wholly to the realm of speculation by the exercise of the undoubted power of the Government to withdraw the privilege of suit upon its gold clause obligations. We have just held that the Court of Claims was without power to entertain the suit in *Nortz* v. *United States, ante,* p. 317, because, regardless of the nature of the obligation of the gold certificates, there was no damage. Here it is declared that there is no damage because Congress, by the exercise of its power to regulate the currency, has made it impossible for the plaintiff to enjoy the benefits of gold payments promised by the Government. It would seem that this would suffice to dispose of the present case, without attempting to prejudge the rights of other bondholders and of the Government under other conditions which may never occur. It will not benefit this plaintiff, to whom we deny any remedy, to be assured that he has an inviolable right to performance of the gold clause.

Moreover, if the gold clause be viewed as a gold value contract, as it is in *Norman* v. *Baltimore & Ohio R. Co., supra,* it is to be noted that the Government has not prohibited the free use by the bondholder of the paper money equivalent of the gold clause obligation; it is the prohibition, by the Joint Resolution of Congress, of payment of the increased number of depreciated dollars required to make up the full equivalent, which alone bars recovery.

In that case it would seem to be implicit in our decision that the prohibition, at least in the present situation, is itself a constitutional exercise of the power to regulate the value of money.

I therefore do not join in so much of the opinion as may be taken to suggest that the exercise of the sovereign power to borrow money on credit, which does not override the sovereign immunity from suit, may nevertheless preclude or impede the exercise of another sovereign power, to regulate the value of money; or to suggest that although there is and can be no present cause of action upon the repudiated gold clause, its obligation is nevertheless, in some manner and to some extent, not stated, superior to the power to regulate the currency which we now hold to be superior to the obligation of the bonds.

Mr. Justice McReynolds, Mr. Justice Van Devanter, Mr. Justice Sutherland, and Mr. Justice Butler dissent.  See below.

---

In the four preceding "*Gold Clause Cases*," viz., *Norman* v. *Baltimore & Ohio R. Co.*, and *United States* v. *Bankers Trust Co., ante,* p. 240; *Nortz* v. *United States, ante,* p. 317; and *Perry* v. *United States, ante,* p. 330, a single dissenting opinion was delivered, immediately after the handing down of the opinion in the *Perry* case.   It is as follows:

Mr. Justice McReynolds, dissenting.

Mr. Justice Van Devanter, Mr. Justice Sutherland, Mr. Justice Butler and I conclude that, if given effect, the enactments here challenged will bring about confiscation of property rights and repudiation of national obligations.   Acquiescence in the decisions just an-

nounced is impossible; the circumstances demand statement of our views. "To let oneself slide down the easy slope offered by the course of events and to dull one's mind against the extent of the danger, . . . that is precisely to fail in one's obligation of responsibility."

Just men regard repudiation and spoliation of citizens by their sovereign with abhorrence; but we are asked to affirm that the Constitution has granted power to accomplish both. No definite delegation of such a power exists; and we cannot believe the farseeing framers, who labored with hope of establishing justice and securing the blessings of liberty, intended that the expected government should have authority to annihilate its own obligations and destroy the very rights which they were endeavoring to protect. Not only is there no permission for such actions; they are inhibited. And no plenitude of words can conform them to our charter.

The Federal government is one of delegated and limited powers which derive from the Constitution. "It can exercise only the powers granted to it." Powers claimed must be denied unless granted; and, as with other writings, the whole of the Constitution is for consideration when one seeks to ascertain the meaning of any part.

---

By the so-called gold clause—promise to pay in " United States gold coin of the present standard of value," or " of or equal to the present standard of weight and fineness "—found in very many private and public obligations, the creditor agrees to accept and the debtor undertakes to return the thing loaned or its equivalent. Thereby each secures protection, one against decrease in value of the currency, the other against an increase.

The clause is not new or obscure or discolored by any sinister purpose. For more than 100 years our citizens have employed a like agreement. During the War between the States, its equivalent " payable in coin " aided

in surmounting financial difficulties. From the housetop men proclaimed its merits while bonds for billions were sold to support the World War. The Treaty of Versailles recognized it as appropriate and just. It appears in the obligations which have rendered possible our great undertakings—public-works, railroads, buildings.

Under the interpretation accepted here for many years, this clause expresses a definite enforceable contract. Both by statute and long use the United States have approved it. Over and over again they have enjoyed the added value which it gave to their obligations. So late as May 2, 1933 they issued to the public more than $550,000,000 of their notes each of which carried a solemn promise to pay in standard gold coin. (Before that day this coin had in fact been withdrawn from circulation, but the statutory measure of value remained the gold dollar of 25.8 grains.)

The Permanent Court of International Justice interpreted the clause as this Court had done and upheld it. Cases of Serbian and Brazilian Loans, Publications P. C. I. J., Series A, Nos. 20–21 (1929). It was there declared: " The gold clause merely prevents the borrower from availing itself of a possibility of discharge of the debt in depreciated currency," and " The treatment of the gold clause as indicating a mere modality of payment, without reference to a gold standard of value, would be, not to construe but to destroy it."

In *Feist* v. *Société Intercommunale Belge d'Electricité,* (1934), A. C. 161, the House of Lords expressed like views.

*Gregory* v. *Morris,* (1878) 96 U. S. 619, 624, 625—last of similar causes—construed and sanctioned this stipulation. In behalf of all, Chief Justice Waite there said:

" The obligation secured by the mortgage or lien under which Morris held was for the payment of gold coin, or, as was said in *Bronson* v. *Rodes,* 7 Wall. [1869] 229, ' an

agreement to deliver a certain weight of standard gold, to be ascertained by a count of coins, each of which is certified to contain a definite proportion of that weight' and is not distinguishable 'from a contract to deliver an equal weight of bullion of equal fineness.' . . . We think it clear, that, under such circumstances, it was within the power of the Court so far as Gregory was concerned, to treat the contract as one for the delivery of so much gold bullion; and, if Morris was willing to accept a judgment which might be discharged in currency, to have his damages estimated according to the currency value of bullion."

Earlier cases—*Bronson* v. *Rodes*, 7 Wall. 229; *Butler* v. *Horwitz*, 7 Wall. 258; *Dewing* v. *Sears*, 11 Wall. 379; *Trebilcock* v. *Wilson*, 12 Wall. 687; *Thompson* v. *Butler*, 95 U. S. 694—while important, need not be dissected. *Gregory* v. *Morris* is in harmony with them and the opinion there definitely and finally stated the doctrine which we should apply.

It is true to say that the gold clauses " were intended to afford a definite standard or measure of value, and thus to protect against a depreciation of the currency and against the discharge of the obligation by payment of less than that prescribed." Furthermore, they furnish means for computing the sum payable in currency if gold should become unobtainable. The borrower agrees to repay in gold coin containing 25.8 grains to the dollar; and if this cannot be secured the promise is to discharge the obligation by paying for each dollar loaned the currency value of that number of grains. Thus, the purpose of the parties will be carried out. Irrespective of any change in currency, the thing loaned or an equivalent will be returned—nothing more, nothing less. The present currency consists of promises to pay dollars of 15 5/21 grains; the Government procures gold bullion on that

basis. The calculation to determine the damages for failure to pay in gold would not be difficult. *Gregory* v. *Morris* points the way.

---

Under appropriate statutes the United States for many years issued gold certificates, in the following form: " This certifies that there have been deposited in the Treasury of The United States of America One Thousand Dollars in gold coin payable to the bearer on demand. This certificate is a legal tender in the amount thereof in payment of all debts and dues public and private."

The certificates here involved—series 1928—were issued under § 6, Act Mar. 14, 1900, 31 Stat. 47, as amended. See U. S. C. Title 31, § 429.[1]

In view of the statutory direction that gold coin for which certificates are issued shall be held for their payment on demand " and used for no other purpose," it seems idle to argue (as counsel for the United States did) that other use is permissible under the ancient Act of March 3, 1863.

By various orders of the President and the Treasury from April 5 to December 28, 1933, persons holding gold certificates were required to deliver them, and accept "an equivalent amount of any form of coin or currency coined

---

[1] In his Annual Report, 1926, 80, 81, the Secretary of the Treasury said: " Gold and silver certificates are in fact mere ' warehouse receipts ' issued by the Government in exchange for gold coin or bullion deposited in the one case, or standard silver dollars deposited in the other case, or against gold or standard silver dollars, respectively, withdrawn from the general fund of the Treasury. . . . Gold certificates, United States notes, Treasury notes of 1890, and Federal reserve notes are directly redeemable in gold." In his letter with the Annual Report, for 1933, 375, he showed that on June 30, 1933, $1,230,717,109 was held in trust against gold certificates and Treasury notes of 1890. The Treasury notes of 1890 then outstanding did not exceed about $1,350,000. Tr. Rep. 1926, 80.

or issued under the laws of the United States designated by the Secretary of the Treasury." Heavy penalties were provided for failure to comply.

That the holder of one of these certificates was owner of an express promise by the United States to deliver gold coin of the weight and fineness established by statute when the certificate issued, or if such demand was not honored to pay the holder the value in the currency then in use, seems clear enough. This was the obvious design of the contract.

---

The Act of March 14, 1900, 31 Stat., c. 41, 45, 47, as amended, in effect until January 31, 1934, provided: "That the dollar consisting of twenty-five and eight-tenths grains of gold nine-tenths fine, . . . shall be the standard unit of value, and all forms of money issued or coined by the United States shall be maintained at a parity of value with this standard," and also " The Secretary of the Treasury is authorized and directed to receive deposits of gold coin with the Treasurer . . . in sums of not less than twenty dollars, and to issue gold certificates therefor in denominations of not less than twenty dollars, and the coin so deposited shall be retained in the Treasury and held for the payment of such certificates on demand, and used for no other purpose." See U. S. C., Title 31, §§ 314, 429.

The Act of February 4, 1910, 36 Stat., c. 25, p. 192, directed " that any bonds and certificates of indebtedness of the United States hereafter issued shall be payable, principal and interest, in United States gold coin of the present standard of value."

By Executive Orders, April 5, and April 20, 1933, the President undertook to require owners of gold coin, gold bullion, and gold certificates, to deliver them on or before May 1st to a Federal Reserve Bank, and to prohibit the exportation of gold coin, gold bullion or gold

certificates. As a consequence the United States were off the gold standard and their paper money began a rapid decline in the markets of the world. Gold coin, gold certificates and gold bullion were no longer obtainable. " Gold is not now paid nor is it available for payment upon public or private debts " was declared in Treasury statement of May 27, 1933; and this is still true. All gold coins have been melted into bars.

The Agricultural Adjustment Act of May 12, 1933, 48 Stat., c. 25, pp. 31, 52, 53—entitled "An act to relieve the existing national economic emergency by increasing agricultural purchasing power, to raise revenue for extraordinary expenses incurred by reason of such emergency, to provide emergency relief with respect to agricultural indebtedness, to provide for the orderly liquidation of joint-stock land banks, and for other purposes," by § 43 provides that " Such notes [United States notes] and all other coins and currencies heretofore or hereafter coined or issued by or under the authority of the United States shall be legal tender for all debts public and private." Also, that the President by proclamation may " fix the weight of the gold dollar . . . as he finds necessary from his investigation to stabilize domestic prices or to protect the foreign commerce against the adverse effect of depreciated foreign currencies." And further, " such gold dollar, the weight of which is so fixed, shall be the standard unit of value, and all forms of money issued or coined by the United States shall be maintained at a parity with this standard and it shall be the duty of the Secretary of the Treasury to maintain such parity, but in no event shall the weight of the gold dollar be fixed so as to reduce its present weight by more than 50 per centum."

The Gold Reserve Act of January 30, 1934, 48 Stat., c. 6, p. 337, 342, undertook to ratify preceding Presidential orders and proclamations requiring surrender of gold

but prohibited him from establishing the weight of the gold dollar " at more than 60 per centum of its present weight." By proclamation, January 31, 1934, he directed that thereafter the standard should contain 15 5/21 grains of gold, nine-tenths fine. (The weight had been 25.8 grains since 1837.) No such dollar has been coined at any time.

On June 5, 1933, Congress passed a " Joint Resolution to assure uniform value to the coins and currencies of the United States." 48 Stat., c. 48, p. 112. This recited that holding and dealing in gold affect the public interest and are therefore subject to regulation; that the provisions of obligations which purport to give the obligee the right to require payment in gold coin or in any amount of money of the United States measured thereby obstruct the power of Congress to regulate the value of money and are inconsistent with the policy to maintain the equal value of every dollar coined or issued. It then declared that every provision in any obligation purporting to give the obligee a right to require payment in gold is against public policy, and directed that " every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts."

Four causes are here for decision. Two of them arise out of corporate obligations containing gold clauses—railroad bonds. One is based on a United States Fourth Liberty Loan bond of 1918, called for payment April 15, 1934, containing a promise to pay " in United States gold coin of the present standard of value " with interest in like gold coin. Another involves gold certificates, series 1928, amounting to $106,300.

As to the corporate bonds the defense is that the gold clause was destroyed by the Resolution of June 5, 1933; and this view is sustained by the majority of the Court.

It is insisted that the agreement in the Liberty Bond, to pay in gold, also was destroyed by the Act of June 5, 1933. This view is rejected by the majority; but they seem to conclude that because of the action of Congress in declaring the holding of gold unlawful, no appreciable damage resulted when payment therein or the equivalent was denied.

Concerning the gold certificates it is ruled that if upon presentation for redemption gold coin had been paid to the holder, as promised, he would have been required to return this to the Treasury. He could not have exported it or dealt with it. Consequently he sustained no actual damage.

There is no challenge here of the power of Congress to adopt such proper " Monetary Policy " as it may deem necessary in order to provide for national obligations and furnish an adequate medium of exchange for public use. The plan under review in the *Legal Tender Cases* was declared within the limits of the Constitution, but not without a strong dissent. The conclusions there announced are not now questioned; and any abstract discussion of Congressional power over money would only tend to befog the real issue.

The fundamental problem now presented is whether recent statutes passed by Congress in respect of money and credits, were designed to attain a legitimate end. Or whether, under the guise of pursuing a monetary policy, Congress really has inaugurated a plan primarily designed to destroy private obligations, repudiate national debts and drive into the Treasury all gold within the country, in exchange for inconvertible promises to pay, of much less value.

Considering all the circumstances, we must conclude they show that the plan disclosed is of the latter description and its enforcement would deprive the parties before us of their rights under the Constitution. Consequently the Court should do what it can to afford adequate relief.

What has been already said will suffice to indicate the nature of these causes and something of our general views concerning the intricate problems presented. A detailed consideration of them would require much time and elaboration; would greatly extend this opinion. Considering also the importance of the result to legitimate commerce, it seems desirable that the Court's decision should be announced at this time. Accordingly, we will only undertake in what follows to outline with brevity our replies to the conclusions reached by the majority and to suggest some of the reasons which lend support to our position.

The authority exercised by the President and the Treasury in demanding all gold coin, bullion and certificates is not now challenged; neither is the right of the former to prescribe weight for the standard dollar. These things we have not considered. Plainly, however, to coin money and regulate the value thereof calls for legislative action.

Intelligent discussion respecting dollars requires recognition of the fact that the word may refer to very different things. Formerly the standard gold dollar weighed 25.8 grains; the weight now prescribed is 15 5/21 grains. Evidently, promises to pay one or the other of these differ greatly in value, and this must be kept in mind.

From 1792 to 1873 both the gold and silver dollar were standard and legal tender, coinage was free and unlimited. Persistent efforts were made to keep both in circulation. Because the prescribed relation between them got out of

harmony with exchange values, the gold coin disappeared and did not in fact freely circulate in this country for 30 years prior to 1834. During that time business transactions were based on silver. In 1834, desiring to restore parity and bring gold back into circulation, Congress reduced somewhat (6%) the weight of the gold coin and thus equalized the coinage and the exchange values. The silver dollar was not changed. The purpose was to restore the use of gold as currency—not to force up prices or destroy obligations. There was no apparent profit for the books of the Treasury. No injury was done to creditors; none was intended. The legislation is without special significance here. See Hepburn on Currency.

The moneys under consideration in the *Legal Tender Cases,* decided May 1, 1871, 12 Wall. 457, and March 3, 1884, 110 U. S. 421, were promises to pay dollars, "bills of credit." They were "a pledge of the national credit," promises "by the Government to pay dollars," "the standard of value is not changed." The expectation, ultimately realized, was that in due time they would be redeemed in standard coin. The Court was careful to show that they were issued to meet a great emergency in time of war, when the overthrow of the Government was threatened and specie payments had been suspended. Both the end in view and the means employed, the Court held were lawful. The thing actually done was the issuance of bills endowed with the quality of legal tender in order to carry on until the United States could find it possible to meet their obligations in standard coin. This they accomplished in 1879. The purpose was to meet honorable obligations—not to repudiate them.

The opinion there rendered declares—" The legal tender acts do not attempt to make paper a standard of value. We do not rest their validity upon the assertion that their emission is coinage, or any regulation of the value of money; nor do we assert that Congress may make any-

thing which has no value money. What we do assert is, that Congress has power to enact that the government's promises to pay money shall be, for the time being, equivalent in value to the representative of value determined by the coinage acts or to multiples thereof." What was said in those causes, of course, must be read in the light of all the circumstances. The opinion gives no support to what has been attempted here.

This Court has not heretofore ruled that Congress may require the holder of an obligation to accept payment in subsequently devalued coins, or promises by the Government to pay in such coins. The legislation before us attempts this very thing. If this is permissible, then a gold dollar containing one grain of gold may become the standard, all contract rights fall, and huge profits appear on the Treasury books. Instead of $2,800,000,000 as recently reported, perhaps $20,000,000,000, maybe enough to cancel the public debt, maybe more!

The power to issue bills and " regulate values " of coin cannot be so enlarged as to authorize arbitrary action, whose immediate purpose and necessary effect is destruction of individual rights.[2] As this Court has said, a " power to regulate is not a power to destroy." 154 U. S. 362, 398. The Fifth Amendment limits all governmental powers. We are dealing here with a debased standard, adopted with the definite purpose to destroy obligations. Such arbitrary and oppressive action is not within any congressional power heretofore recognized.

---

[2] " It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power; and if any be prescribed where are they to be found if the property of an individual fairly and honestly acquired may be seized without compensation." Chief Justice Marshall in *Fletcher* v. *Peck*, 6 Cranch 87, 135.

The authority of Congress to create legal tender obligations in times of peace is derived from the power to borrow money; this cannot be extended to embrace the destruction of all credits.

There was no coin—specie—in general circulation in the United States between 1862 and 1879. Both gold and silver were treated in business as commodities. The Legal Tender Cases arose during that period.

CORPORATE BONDS—

The gold clauses in these bonds were valid and in entire harmony with public policy when executed. They are property—*Lynch* v. *United States*, 292 U. S. 571, 579. To destroy a validly acquired right is the taking of property—*Osborn* v. *Nicholson*, 13 Wall. 654, 662. They established a measure of value and supply a basis for recovery if broken. Their policy and purpose were stamped with affirmative approval by the Government when inserted in its bonds.

The clear intent of the parties was that in case the standard of 1900 should be withdrawn, and a new and less valuable one set up, the debtor could be required to pay the value of the contents of the old standard in terms of the new currency, whether coin or paper. If gold measured by prevailing currency had declined, the debtor would have received the benefit. The Agricultural Adjustment Act of May 12th discloses a fixed purpose to raise the nominal value of farm products by depleting the standard dollar. It authorized the President to reduce the gold in the standard, and further provided that all forms of currency should be legal tender. The result expected to follow was increase in nominal values of commodities and depreciation of contractual obligations. The purpose of § 43, incorporated by the Senate as an amendment to the House Bill, was clearly stated by the

Senator who presented it.[3]  It was the destruction of lawfully acquired rights.

In the circumstances existing just after the Act of May 12th, depreciation of the standard dollar by the Presidential proclamation would not have decreased the amount required to meet obligations containing gold clauses.  As to them the depreciation of the standard would have caused an increase in the number of dollars of depreciated currency.  General reduction of all debts could only be secured by first destroying the contracts evidenced by the gold clauses; and this the Resolution of June 5th undertook to accomplish.  It was aimed directly at those contracts and had no definite relation to the power to issue bills or to coin or regulate the value of money.

To carry out the plan indicated as above shown in the Senate, the Gold Reserve Act followed—January 30, 1934. This inhibited the President from fixing the weight of the standard gold dollar above 60% of its then existing weight.  (Authority had been given for 50% reduction by the Act of May 12th.)  On January 31st he directed that the standard should contain 15 5/21 grains of gold.  If this reduction of 40% of all debts was within the power of Congress and if, as a necessary means to accomplish that end, Congress had power by resolution to destroy the

[3] He said—" This amendment has for its purpose the bringing down or cheapening of the dollar, that being necessary in order to raise agricultural and commodity prices.  . . .  The first part of the amendment has to do with conditions precedent to action being taken later.

" It will be my task to show that if the amendment shall prevail it has potentialities as follows: It may transfer from one class to another class in these United States value to the extent of almost $200,000,-000,000.  This value will be transferred, first, from those who own the bank deposits.  Secondly, this value will be transferred from those who own bonds and fixed investments." Cong. Record, April 1933, pp. 2004, 2216, 2217, 2219.

gold clauses, the holders of these corporate bonds are without remedy. But we must not forget that if this power exists, Congress may readily destroy other obligations which present obstruction to the desired effect of further depletion. The destruction of all obligations by reducing the standard gold dollar to one grain of gold, or brass or nickel or copper or lead, will become an easy possibility. Thus we reach the fundamental question which must control the result of the controversy in respect of corporate bonds. Apparently in the opinion of the majority the gold clause in the Liberty bond withstood the June 5th Resolution notwithstanding the definite purpose to destroy them. We think that in the circumstances Congress had no power to destroy the obligations of the gold clauses in private obligations. The attempt to do this was plain usurpation, arbitrary and oppressive.

The oft repeated rule by which the validity of statutes must be tested is this—" Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited but consistent with the letter and spirit of the Constitution, are constitutional."

The end or objective of the Joint Resolution was not " legitimate." The real purpose was not " to assure uniform value to the coins and currencies of the United States," but to destroy certain valuable contract rights. The recitals do not harmonize with circumstances then existing. The Act of 1900 which prescribed a standard dollar of 25.8 grains remained in force; but its command that " all forms of money issued or coined by the United States shall be maintained at a parity of value with this standard " was not being obeyed. Our currency was passing at a material discount; all gold had been sequestrated; none was attainable. The Resolution made no provision for restoring parity with the old standard; it established no new one.

This Resolution was not appropriate for carrying into effect any power entrusted to Congress. The gold clauses in no substantial way interfered with the power of coining money or regulating its value or providing an uniform currency. Their existence, as with many other circumstances, might have circumscribed the effect of the intended depreciation and disclosed the unwisdom of it. But they did not prevent the exercise of any granted power. They were not inconsistent with any policy theretofore declared. To assert the contrary is not enough. The Court must be able to see the appropriateness of the thing done before it can be permitted to destroy lawful agreements. The purpose of a statute is not determined by mere recitals—certainly they are not conclusive evidence of the facts stated.

Again, if effective, the direct, primary and intended result of the Resolution will be the destruction of valid rights lawfully acquired. There is no question here of the indirect effect of lawful exercise of power. And citations of opinions which upheld such indirect effects are beside the mark. This statute does not "work harm and loss to individuals indirectly," it destroys directly. Such interference violates the Fifth Amendment; there is no provision for compensation. If the destruction is said to be for the public benefit, proper compensation is essential; if for private benefit, the due process clause bars the way.

Congress has power to coin money but this cannot be exercised without the possession of metal. Can Congress authorize appropriation, without compensation, of the necessary gold? Congress has power to regulate commerce, to establish post roads, &c. Some approved plan may involve the use or destruction of A's land or a private way. May Congress authorize the appropriation or destruction of these things without adequate payment? Of

course not. The limitations prescribed by the Constitution restrict the exercise of all power.

*Ling Su Fan* v. *United States,* 218 U. S. 302, supports the power of the legislature to prevent exportation of coins without compensation. But this is far from saying that the legislature might have ordered destruction of the coins without compensating the owners or that they could have been required to deliver them up and accept whatever was offered. In *United States* v. *Lynah,* 188 U. S. 445, 471, this Court said—" If any one proposition can be considered as settled by the decisions of this court it is that although in the discharge of its duties the Government may appropriate property, it cannot do so without being liable to the obligation cast by the fifth amendment of paying just compensation."

GOVERNMENT BONDS—

Congress may coin money; also it may borrow money. Neither power may be exercised so as to destroy the other; the two clauses must be so construed as to give effect to each. Valid contracts to repay money borrowed cannot be destroyed by exercising power under the coinage provision. The majority seem to hold that the Resolution of June 5th did not affect the gold clauses in bonds of the United States. Nevertheless we are told that no damage resulted to the holder now before us through the refusal to pay one of them in gold coin of the kind designated or its equivalent. This amounts to a declaration that the Government may give with one hand and take away with the other. Default is thus made both easy and safe!

Congress brought about the conditions in respect of gold which existed when the obligation matured. Having made payment in this metal impossible, the Government cannot defend by saying that if the obligation had been met the creditor could not have retained the gold; con-

sequently he suffered no damage because of the nonde-
livery. Obligations cannot be legally avoided by prohib-
iting the creditor from receiving the thing promised. The
promise was to pay in gold, standard of 1900, otherwise to
discharge the debt by paying the value of the thing prom-
ised in currency. One of these things was not prohibited.
The Government may not escape the obligation of mak-
ing good the loss incident to repudiation by prohibiting
the holding of gold. Payment by fiat of any kind is be-
yond its recognized power. There would be no serious
difficulty in estimating the value of 25.8 grains of gold in
the currency now in circulation.

These bonds are held by men and women in many parts
of the world; they have relied upon our honor. Thou-
sands of our own citizens of every degree, not doubting
the good faith of their sovereign, have purchased them.
It would not be easy for this multitude to appraise the
form of words which establishes that they have suffered
no appreciable damage; but perhaps no more difficult for
them than for us. And their difficulty will not be as-
suaged when they reflect that ready calculation of the
exact loss suffered by the Philippine government moved
Congress to satisfy it by appropriating, in June 1934, $23,-
862,750.78 to be paid out of the Treasury of the United
States.[4] And see Act May 30, 1934, 48 Stat. 817, appro-

---

[4] AN ACT relating to Philippine currency reserves on deposit in the
United States.

Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled, That the Secretary
of the Treasury is authorized and directed, when the funds therefor
are made available, to establish on the books of the Treasury a credit
in favor of the Treasury of the Philippine Islands for $23,862,750.78,
being an amount equal to the increase in value (resulting from the
reduction of the weight of the gold dollar) of the gold equivalent at
the opening of business on January 31, 1934, of the balances main-
tained at that time in banks in the continental United States by the

priating $7,438,000 to meet losses sustained by officers and employees in foreign countries due to appreciation of foreign currencies in their relation to the American dollar.

GOLD CERTIFICATES—

These were contracts to return gold left on deposit; otherwise to pay its value in the currency. Here the gold was not returned; there arose the obligation of the Government to pay its value. The Court of Claims has jurisdiction over such contracts. Congress made it impossible for the holder to receive and retain the gold promised him; the statute prohibited delivery to him. The contract being broken the obligation was to pay in currency the value of 25.8 grains of gold for each dollar called for by the certificate. For the Government to say, we have violated our contract but have escaped the consequences through our own statute, would be monstrous. In matters of contractual obligation the Government can not legislate so as to excuse itself.

These words of Alexander Hamilton ought not to be forgotten—

" When a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent, with the same rights and obligations as an individual. Its promises may be

Government of the Philippine Islands for its gold standard fund and its Treasury certificate fund less the interest received by it on such balances.

Sec. 2. There is hereby authorized to be appropriated, out of the receipts covered into the Treasury under section 7 of the Gold Reserve Act of 1934, by virtue of the reduction of the weight of the gold dollar by the proclamation of the President on January 31, 1934, the amount necessary to establish the credit provided for in section 1 of this Act. Approved, June 19, 1934.

justly considered as excepted out of its power to legislate, unless in aid of them. It is in theory impossible to reconcile the idea of a promise which obliges, with a power to make a law which can vary the effect of it." 3 Hamilton's Works, 518, 519.

.These views have not heretofore been questioned here. In the *Sinking-Fund Cases,* 99 U. S. 700, 719, Chief Justice Waite speaking for the majority declared: " The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen. No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation. All this is indisputable."

And in the same cause, (731, 732) Mr. Justice Strong, speaking for himself, affirmed: " It is as much beyond the power of a legislature, under any pretence, to alter a contract into which the government has entered with a private individual, as it is for any other party to a contract to change its terms without the consent of the person contracting with him. As to its contract the government in all its departments has laid aside its sovereignty, and it stands on the same footing with private contractors."

Can the Government, obliged as though a private person to observe the terms of its contracts, destroy them by legislative changes in the currency and by statutes forbidding one to hold the thing which it has agreed to deliver? If an individual should undertake to annul or lessen his obligation by secreting or manipulating his assets with the intent to place them beyond the reach of creditors, the attempt would be denounced as fraudulent, wholly ineffective.

Counsel for the Government and railway companies asserted with emphasis that incalculable financial disaster would follow refusal to uphold, as authorized by the Constitution, impairment and repudiation of private obligations and public debts. Their forecast is discredited by manifest exaggeration. But, whatever may be the situation now confronting us, it is the outcome of attempts to destroy lawful undertakings by legislative action; and this we think the Court should disapprove in no uncertain terms.

Under the challenged statutes it is said the United States have realized profits amounting to $2,800,000,000.[5] But this assumes that gain may be generated by legislative fiat. To such counterfeit profits there would be no limit; with each new debasement of the dollar they would expand. Two billions might be ballooned indefinitely—to twenty, thirty, or what you will.

Loss of reputation for honorable dealing will bring us unending humiliation; the impending legal and moral chaos is appalling.

---

[5] In a radio address concerning the plans of the Treasury, August 28, 1934, the Secretary of the Treasury, as reported by the Commercial and Financial Chronicle of September 1, 1934, stated:

" But we have another cash drawer in the Treasury, in addition to the drawer which carries our working balance. This second drawer I will call the ' gold ' drawer. In it is the very large sum of $2,800,-000,000, representing ' profit ' resulting from the change in the gold content of the dollar. Practically all of this ' profit ' the Treasury holds in the form of gold and silver. The rest is in other assets.

" I do not propose here to subtract this $2,800,000,000 from the net increase of $4,400,000,000 in the national debt—thereby reducing the figure to $1,600,000,000. And the reason why I do not subtract it is this: for the present this $2,800,000,000 is under lock and key. Most of it, by authority of Congress, is segregated in the so-called stabilization fund, and for the present we propose to keep it there. But I call your attention to the fact that ultimately we expect this ' profit ' to flow back into the stream of our other revenues and thereby reduce the national debt."