# In re AMERICAN WRITING PAPER CO., Inc.
## No. 55719.

### District Court, D. Massachusetts.
### July 2, 1935.

Indentures in question were to be performed in Massachusetts, and lessee was under no obligation either to perform contract in London or any other foreign market or to import gold for purpose of selling it to United States mints and turning proceeds over to lessor.

Choate, Hall & Stewart, of Boston, Mass., for American Writing Paper Co.

Warren, Garfield, Whiteside & Lamson, of Boston, Mass., for Holyoke Water Power Co.

BREWSTER, District Judge.

In the above-entitled matter the Holyoke Water Power Company (hereinafter referred to as petitioner) has intervened as a creditor, in order to establish the amount of rentals due under certain indentures for the lease of mill powers. The rentals involved are those falling due July 1 and October 1, 1934, and January 1, 1935. The clause, providing for the payment of semiannual rentals, common to all of them, is as follows:

"A quantity of gold which shall be equal in amount to $——— of the gold coin of the United States of the standard of the weight and fineness of the year ———, or the equivalent of this commodity in United States currency."

The different years given in the several clauses fell within the period from 1881 to 1894, during all of which time the standard weight and fineness of the gold coin of the United States was 25.8 grains of ninetenths fine for each dollar.

The net quantities of gold to which the petitioner would have been entitled under all of the indentures and its equivalent, according to its claim, are as follows: July 1, 1934, 1055.978 troy ounces pure (1173.30875%10 fine) $36,959.23; October 1, 1934, 14.39728 troy ounces pure (16.0992 %10 fine)

$507.13; January 1, 1935, 944.76039 troy ounces pure (1049.73374%₁₀ fine) $33,066.61.

In the case of the Holyoke Water Power Co. v. American Writing Paper Co., Inc. (D. C.) 9 F. Supp. 451, 453, in a carefully considered opinion, Judge McLellan held, with respect to the debtor's obligation under these identical leases, for the rent accruing January 1, 1934, that the clauses constituted commodity contracts, as distinguished from money contracts, and that therefore, as pre-existing contracts, they did not come within the purview of the joint resolution of Congress of June 5, 1933, which provided that:

"Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts." (31 USCA § 463 (a).

In that case the debtor requested the court to rule that its obligations could be discharged by payment, dollar for dollar, of the amounts mentioned in the indentures. This ruling was denied, the court stating:

"The indentures contain no covenant to pay any definite sum of money. The number of dollars mentioned was the means of determining the amount of gold to be delivered or the amount of gold the equivalent whereof was to be paid in currency. The result which the defendant seeks cannot be reached in this way, without doing violence to the intention of the parties as expressed in their contracts."

Judge McLellan further held that the obligation to pay in gold had become impossible of performance, and that there remained only the obligation to pay the equivalent of this commodity (gold) in currency. Upon the evidence before him, he concluded that the equivalent in currency would be the number of ounces of gold, called for by the respective indentures, multiplied by $20.67 per ounce, the price which the United States Treasury was then paying in legal tender currency for the gold surrendered in accordance with the Act of March 9, 1933, § 3 (12 USCA § 248 (n) and the orders of the Secretary of the Treasury issued pursuant to said act on December 28, 1933.

Inasmuch as the same indentures and the same parties were before the court in the earlier proceeding, I feel bound by the rulings of the learned judge, so far as applicable to the facts before me, Wakelee v. Davis (C. C.) 44 F. 532; Shreve v. Cheesman (C. C. A.) 69 F. 785; Commercial Union of America, Inc., v. Anglo-South American Bank, Ltd. (C. C. A.) 10 F.(2d) 937, unless they cannot stand in the light of the recent decisions of the Supreme Court in the so-called Gold Cases, Norman v. Baltimore & O. R. Co., 294 U. S. 240, 55 S. Ct. 407, 79 L. Ed. 885, 95 A. L. R. 1352; Nortz v. United States, 294 U. S. 317, 55 S. Ct. 428, 79 L. Ed. 907, 95 A. L. R. 1346; Perry v. United States, 294 U. S. 330, 55 S. Ct. 432, 79 L. Ed. 912, 95 A. L. R. 1335.

If Judge McLellan's views are to prevail, the only question presented in the instant petition is whether they are applicable to the situation which has developed since January 1, 1934. It becomes necessary, therefore, at the outset to determine whether the ruling of Judge McLellan, denying to the lessee the right to discharge its obligation dollar for dollar in any currency which, at the time of the payment, was legal tender for public or private debts, is compatible with the decision of the Supreme Court in Norman v. Baltimore & O. R. Co., 294 U. S. 240, 55 S. Ct. 407, 418, 79 L. Ed. 885, 95 A. L. R. 1352.

The debtor relies upon dictum appearing in the opinion of the Chief Justice in the following language:

"But, if the clauses are treated as 'gold value' clauses, that is, as intended to set up a measure or standard of value if gold coin is not available, we think they are still hostile to the policy of the Congress, and hence subject to prohibition."

I am unable to agree with the debtor's counsel that this language is inconsistent with the conclusion reached by Judge McLellan. It is clearly manifested all through the opinion that the court is dealing with money contracts and not commodity contracts. The Chief Justice observes:

"We are of the opinion that the gold clauses now before us were not contracts for payment in gold coin as a commodity, or in bullion, but were contracts for the payment of money. The bonds were severally for the payment of $1,000."

It is significant that in the language relied upon by the debtor the Chief Justice was referring to clauses intended to set up a measure or standard of value if gold coin was not available.

It is evident, from debates in the Senate upon the joint resolution of June 5, 1933, that Congress was attempting to steer clear of constitutional difficulties by limiting the repudiation of gold clauses in public and private contracts to those calling for payment of gold as currency, and not as a commodity. The definition of the word "obligation," as used in the resolution, is expressly confined to "obligations payable in money of the United States." Debtor's obligations to pay a quantity of gold does not fall within the definition. The debtor contends that, since the obligation to pay gold has become impossible of performance, and the alternative is to pay its equivalent in United States currency, it comes within the definition. This contention cannot prevail over Judge McLellan's ruling to the contrary.

■ Notwithstanding subsequent events, to be considered later, I still hold, with Judge McLellan, that the debtor's obligation to pay rentals in gold is impossible of performance. The contracts were to be performed in Holyoke, and the debtor was under no obligation either to perform the contract in London or any other foreign market or to import the gold for the purpose of selling it to the United States mints and turning the proceeds over to the petitioner.

■ The court is now confronted, therefore, with the necessity of determining what amount, in available United States currency, would constitute the equivalent of the ounces of gold which the debtor undertook to pay by way of rental.

Two conflicting views are advanced by the parties. The petitioner argues that legislation enacted and regulations promulgated subsequent to January 21, 1934, have given rise to a situation which has enabled it to establish a market price for gold as a commodity considerably in excess of $20.67 an ounce.

The debtor, on the other hand, urges that the decisions of the Supreme Court in the cases of Nortz v. United States, 294 U. S. 317, 55 S. Ct. 428, 431, 79 L. Ed. 907 95 A. L. R. 1346, and Perry v. United States, 294 U. S. 330, 55 S. Ct. 432, 79 L. Ed. 912, 95 A. L. R. 1335, are controlling and admit of no conclusion other than that the price paid for gold surrendered under the orders of the Secretary of the Treasury still must prevail.

With respect to the petitioner's contention, the following facts have appeared:

(1) That on January 15, 1934, the Secretary of the Treasury fixed January 17, 1934, as the expiration of the period within which gold might be delivered in compliance with the order of the Secretary of the Treasury of December 28, 1933, as amended. The Treasurer of the United States, the mints, any fiscal agent of the United States were instructed to pay, after January 17, 1934, $20.67 an ounce for gold held in noncompliance with said order, but with the reservation that, in the event that any gold coin, gold bullion, or gold certificates were held in noncompliance with the order and offered after January 17, 1934, "there shall be paid therefor only such part or none of the amount otherwise payable therefor as the Secretary of the Treasury may from time to time prescribe and the whole or any balance shall be retained and applied to the penalty payable for failure to comply with the requirements" of said order.

After the proclamation of the President reducing the gold content of the dollar, the instructions to pay $20.67 for gold coin, gold bullion, or gold certificates, held in noncompliance with the order of the Secretary of the Treasury, continued in full force, notwithstanding devaluation, and, so far as appears, the instructions obtained on the rent days involved in this proceeding.

(2) On January 30, 1934, the Gold Reserve Act of 1934 was signed. This act, inter alia, authorized the Secretary of the Treasury to purchase gold in any amounts, at home or abroad, as he might deem advantageous to the public interest and authorized the Secretary to issue rules and regulations necessary and proper to carry out the purposes of this act.

(3) On January 30 and 31, 1934, the Secretary of the Treasury issued Provisional Regulations under the Gold Reserve Act of 1934. Article VI of the Regulations related to the purchase of gold by mints, and Article VII to the sale of such gold. Under section 35, the mints were authorized to purchase (a) gold recovered from natural deposits in the United States; (b) unmelted scrap gold; (c) gold imported into the United States after January 30, 1934; and (d) such other gold as may be authorized from time to time by rulings of the Secretary of the Treasury.

This section contained the following proviso:

"Provided, however, That no gold shall be purchased by any mint or assay office under the provisions of this article which, in the opinion of the mint, has been held at any time in noncompliance with the act of March 9, 1933, any Executive orders or orders of the Secretary of the Treasury issued thereunder, or in noncompliance with any regulations prescribed under such orders or licenses issued pursuant thereto or which, in the opinion of the mint, has been acquired and held, transported, melted or treated or held in custody in violation of the Act or of regulations issued thereunder, including these regulations."

By section 40 the mints were authorized to purchase only such gold imported into the United States as had been in Customs custody throughout the period in which it shall have been situated within the Customs limits of the continental United States, and then only subject to certain specified provisions regarding entry and declaration to the Collector of Customs.

Section 42 of the Regulations fixed the purchase price at $35 (less ¼ of 1 per cent.) per troy ounce of fine gold. And section 43 authorized the mints to sell gold to persons licensed to acquire the same at the price of $35 (plus ¼ of 1 per cent.) per troy ounce of fine gold.

It is said that the reports issued by the Treasury Department at Washington show that since these regulations had become effective over 99 per cent. of the gold purchases by the Department has been made under the provisions of these regulations.

(4) On January 31, 1934, the President issued his proclamation reducing the gold content of the dollar from 25.8 grains of gold 9/10 fine to 15 5/21 grains of gold 9/10 fine.

(5) There was admitted, over the objections of the debtor, evidence that in the London market gold was sold at $35 per troy ounce.

Apparently Judge McLellan attached little importance to the reservation contained in the order of January 15, 1934, since he accepted as relevant evidence of market price the price obtainable from the government on January 17, 1934, when the price was expressly determined by executive order to be $20.67 an ounce.

If debtor's liability for rent is to be measured by the price at which certain kinds of gold are bought and sold by the United States mint, it could well be found that $35 per troy ounce was the fair market price for such gold, and in this view the price prevailing in the London market might have remote relevancy; otherwise, it could not be regarded as material.

The difficulty with such a criterion is that the market for the gold purchased by the mints is closed to the petitioner. If it should receive, at Holyoke, the requisite quantity of gold called for by the indentures, it could obtain for it no more than $20.67 per troy ounce of pure gold, whether coin or bullion. Nortz v. United States, supra; Perry v. United States, supra.

While it is true that in the Nortz Case the contract involved was for the payment of gold coin, it was nevertheless conceded that Congress had the power "to appropriate unto the Government outstanding gold bullion, gold coin and gold certificates." This is precisely what was done by the Act of March 9, 1933, and the order of the Secretary of the Treasury of December 28, 1933. Any gold bullion received on account of rentals falling due in July or October, 1934, or January, 1935, would be held by the petitioner in noncompliance with the orders, and the only opportunity open to it would be to surrender it and to receive $20.67 per ounce. In no market could it obtain a better price. In Nortz v. United States, supra, the court observed:

"The asserted basis of plaintiff's claim for actual damages is that, by the terms of the gold certificates, he was entitled, on January 17, 1934, to receive gold coin. It is plain that he cannot claim any better position than that in which he would have been placed had the gold coin then been paid to him. But, in that event, he would have been required, under the applicable legislation and orders, forthwith to deliver the gold coin to the Treasury. Plaintiff does not bring himself within any of the stated exceptions."

This language would be equally applicable to gold bullion, had that been paid to Nortz. It is pertinent to the situation presented in the instant case.

To accept the petitioner's theory is to confer upon it benefits which it could not have received had the gold been delivered in accordance with the provisions of the indentures. I am of the opinion that the legislation and regulations issued thereunder do not warrant a conclusion different from that of Judge McLellan in the earlier case.

Claim, therefore, may be established against this debtor for an amount obtained by multiplying the number of ounces of pure gold by $20.67 per ounce.

I sympathize with the debtor's argument that it would make for convenience and certainty if the contracts were brought within the purview of the joint resolution so that the liability could be discharged dollar for dollar, but the rights of parties, of course, cannot be determined on considerations of expediency, or convenience.